IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 24, 2007 Session

# DERRICK QUINTERO and WILLIAM EUGENE HALL, JR.
# v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Humphreys County**
**No. 8849; 8850     Robert E. Burch, Judge**

—————

**No. M2005-02959-CCA-R3-PD - Filed July 7, 2008**

—————

The appellants, Derrick Quintero and William Eugene Hall, Jr., were each convicted on two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary. They both received the death penalty for the murder of one of the victims, a life sentence for the other murder conviction, and an effective eighty year sentence for the remaining convictions. The appellants were unsuccessful in their direct appeals. See State v. Hall and Quintero, 976 S.W. 2d 121 (Tenn. 1998). Appellants filed individual pro se post-conviction petitions and simultaneously joint petitions for writ of error coram nobis. Appellants alleged various constitutional violations, including the ineffective assistance of counsel and the existence of newly discovered evidence. Following a joint hearing on the petitions the trial court denied relief. We affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which David H. Welles, and Jerry L. Smith, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, and Kathleen G. Morris, Nashville, Tennessee (on appeal); Shipp Weems, District Public Defender, Steve Stack, Assistant Public Defender, John E. Herbison and Paul Buchanan, Nashville, Tennessee (at trial), for the appellant, Derrick Quintero.

Patrick T. McNally, Nashville, Tennessee (at trial and on appeal); Paul J. Bruno, Nashville, Tennessee (on appeal); Jennifer Davis Roberts, Dickson, Tennessee (at trial); and N. Reese Bagwell, Clarksville, Tennessee (at trial), for the appellant, William Eugene Hall, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson and James W. Kirby, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The appellants were part of a group of eight inmates who escaped from prison in Eddyville, Kentucky on Thursday morning, June 16, 1988. Three of the escapees were captured near the prison in Kentucky. Five of the escapees, William Eugene Hall, Jr., Derrick Quintero, James Blanton, Joseph Montgomery and Ronnie Hudson, eventually made their way to a community in Stewart County, Tennessee near Kentucky Lake. Several homes in the area were reported burglarized prior to Monday, June 20, 1988, and the victims in this case were murdered in their home the night of Monday, June 20. Montgomery and Hudson left the other three escapees and returned to Kentucky on Sunday, June 19, 1988, and they spent the next few days with Hudson's family until their arrest on June 22, 1988. The appellants and Blanton fled Stewart County and were seen in Memphis on Tuesday, June 21, 1988. Hall was eventually captured in Texas, and Quintero and Blanton were subsequently apprehended in Mexico.

Quintero and Hall were each convicted on two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny, and three counts of first degree burglary. They both received the death penalty for the murder of one of the victims, a life sentence for the other murder conviction, and an effective eighty year sentence for the remaining convictions. The trial lasted just over six weeks. The appellants were unsuccessful in their direct appeals. See State v. Hall and Quintero, 976 S.W.2d 121 (Tenn. 1998). Though Blanton was indicted along with the appellants, he successfully moved to sever his case. Blanton also received the death penalty for one of his two murder convictions. State v. Blanton, 975 S.W.2d 269 (Tenn. 1998). Blanton died in prison in 1999.

The appellants filed individual pro se post-conviction petitions in May 1999. The trial court appointed counsel for each appellant, and they subsequently filed amended petitions on behalf of the appellants in August 2001. Following a joint hearing on the petitions in March and April 2003, the trial court denied relief. In October 2004, the court entered written orders for each appellant detailing the testimony heard at the hearing and addressing each of the claims presented in the written petitions.

The convicting evidence was wholly circumstantial. The summary of facts below is rather lengthy, but necessary in light of the claims raised by the appellants. Although the appellants admitted during the post-conviction hearing that they participated in several of the burglaries, they both denied murdering the victims, breaking into their home or stealing their car. They claimed they were on their way to Memphis the morning the murders occurred. The appellants proffered the deposition of Quintero's father and their own testimony in support of their alibi.

Furthermore, the appellants both filed a joint petition for a writ of error coram nobis. The basis of the petition was testimony of two fellow death row inmates who stated that Blanton confessed to them that he acted alone, or with another individual, breaking into the victims' home and killing them. According to these inmates, Blanton told them he did not come forward earlier because he did not want to jeopardize his own case. Blanton died in prison in 1999. The error

coram nobis petition was not filed until March 31, 2003, the first day of the hearing on the post-conviction petitions. According to the petition, counsel became aware of these inmates' statements in the "summer of 2002." Although Blanton died in 1999, it is unclear from the record when the two inmates revealed their information to the appellants. The trial court suspended the statute of limitations and considered the merits of the petition. The court, however, denied relief on the petition.

Facts

The following is the supreme court's summary of the trial testimony:

The proof introduced by the State during the guilt phase of the trial demonstrated that Myrtle and Buford Vester were murdered in their home in the Leatherwood community of Stewart County, which is situated on Kentucky Lake and in close proximity to the Tennessee-Kentucky border. The Vesters were murdered sometime after their son left their home at 6:00 p.m. on Sunday, June 19, 1988 and sometime before their bodies were discovered by their neighbor around 10:00 a.m. on Wednesday, June 22, 1988.

Along with six other men, the defendants in this appeal, Derrick Quintero and William Hall, escaped from the Kentucky State Penitentiary at Eddyville during the early morning hours of June 16, 1988. Three of the escapees [Bobby Sherman, Leo Sperling, and Floyd Cook] were apprehended in the vicinity of the prison on or before June 18, 1988. However, the other five escapees, including Quintero, Hall, James Blanton, Joseph Montgomery, and Ronnie Hudson left the area in a 1966 Chevrolet pick-up truck which they stole from Curtis Rogers who lived about one-half of a mile from the prison facility. [The truck was located seventeen months after the escape in a wooded area of Stewart County, Tennessee. It had been completely covered with branches.]

The Stewart County Sheriff's department was notified at 2:30 a.m. on June 16 that inmates had escaped from the penitentiary at Eddyville. After news of the escape had been broadcast to the public, the Sheriff's department received a telephone call from Zachery Pallay, a resident of the Leatherwood community, warning that Quintero was familiar with the area and would probably seek refuge there. The Sheriff's department's [sic] also received several reports of suspicious individuals in the Leatherwood area including a report of three men attempting to flag down a car. However, when a rash of burglaries broke out in the Leatherwood community, the Sheriff's department became convinced that the escapees were in the area. The burglarized residences in Stewart County were owned by Jim McMinn, Neal Foster, Essie Settles, Alfred Cherry, Thomas Harris, and John and Virginia Crawford.

Though it is not possible to determine from the record the precise order in which the

-3-

burglaries occurred, the proof demonstrates that five of the six burglaries occurred before 1:00 p.m. on Sunday, June 19, 1988.

The first burglary was reported and occurred on June 18, 1988. That day, Jim McMinn of Clarksville, Tennessee, arrived at his cabin in the Leatherwood area at approximately noon. He left the cabin to go fishing in his boat at around 1:00 p.m. Upon returning to the cabin at 2:30 or 3:00 p.m., McMinn noticed a box of shotgun shells lying on the floor and discovered that his loaded .22 caliber pistol was missing from the bedroom. The telephone in his cabin had been removed from the wall, and the outside portion of the phone line also had been severed. McMinn went to his truck and discovered that the windows had been rolled up and the ignition destroyed with his ax. The telephone from McMinn's cabin was in the bed of the truck.

Following the report of the McMinn burglary on June 18, the Sheriff's Department initiated an intensive search of the area, utilizing helicopters, four-wheel drive vehicles, and tracking dogs. At one point law enforcement officers chased some individuals on foot through the woods, but they were not able to overtake the persons suspected to be the escapees.

At some point, perhaps during that chase, Hudson and Montgomery became separated from the defendants and Blanton. Hudson and Montgomery left the Leatherwood community and drove to Lebanon, Kentucky in a 1982 White Ford Fairmont they stole from Essie Settles, a resident of the Standing Rock Community, which is approximately six highway miles from the Leatherwood community. Montgomery's fingerprint was found on Settles' garage door. Hudson's fingerprint was found inside the car when it was later recovered. Settles had seen the car in her garage around 10:00 a.m. on Saturday morning and discovered that it was missing at approximately 1:30 p.m. on Sunday afternoon. The proof demonstrated that the car was stolen sometime Saturday night or before daylight on Sunday morning. Burned matches were found inside the garage indicating that it had been dark when the theft occurred. In addition, when she watered her flowers around 8:00 a.m. on Sunday morning, Settles noticed that someone had removed the hose from the outside faucet during the night. Settles stated that the hose had been connected when she had used it on Saturday evening around 6:00 p.m.

Hudson and Montgomery arrived at Hudson's brother's apartment in Lebanon, Kentucky on Sunday, June 19, at approximately 1:00 p.m. They were driving a white car with Tennessee license plates, which witnesses identified at trial as the vehicle which had been stolen from Settles. Hudson's brother and a friend accompanied the two escapees to a secluded area on the river where Hudson and Montgomery hid the stolen car among the weeds. Around 6:00 or 6:30 p.m., Hudson's brother left the two escapees in the company of Hudson's mother and sister. The next day, Hudson's sister, her two children, and Martha Grover picked up the two escapees and

transported them to Grover's apartment where they stayed until early evening on Tuesday, June 21. The following day, Wednesday, June 22, Kentucky authorities apprehended both Hudson and Montgomery near the location where Settles' car had been hidden. Shots were exchanged prior to the convicts' apprehension. Hudson and Montgomery had in their possession McMinn's .22 caliber pistol and a .22 caliber pistol which had been stolen from another resident of the Leatherwood community, Neal Foster. Two live rounds were recovered from Foster's pistol, and four spent shells were recovered in the area. While this proof demonstrated that Hudson and Montgomery were some two hundred miles away in Lebanon, Kentucky when the Vesters were murdered in Stewart County, Tennessee, it also showed that the McMinn and Foster burglaries occurred before 1:00 p.m. on June 19.

The Cherry and Harris burglaries were discovered around 3:00 or 4:00 p.m. on June 19, 1988 by Alfred Cherry. Cherry's trailer was located approximately one-half of a mile from the murder victims' residence. The inside of the trailer was in disarray. A bed was unmade and wet towels were in the bathroom. The refrigerator light switch had been taped down to prohibit the light from operating when the refrigerator door was opened. The hot water tank had been set on high.

Missing from the trailer were two bedspreads, a green thermal blanket, a sleeping bag, a portable radio, approximately fifteen cassette tapes, a rechargeable flashlight, a small handsaw, six knives, coffee mugs, various canned goods, a gallon of homemade wine, two bottles of bourbon, a six-pack of beer, a toothbrush, underwear, and two paperweights bearing the Cumberland Electric logo. [These paperweights were found seventeen months later in the bed of the 1966 Chevrolet truck which the escapees had stolen near Eddyville and driven to the Leatherwood community.]

Cherry did not have a telephone in his trailer. Upon discovering the burglary, he went next door to call the police on the telephone in the trailer owned by his brother-in-law, Thomas Harris. Cherry discovered that Harris' trailer had also been burglarized. The trailer had been ransacked. The refrigerator light had been removed. The sink was full of dirty dishes, and food was in a skillet on the stove. Wet towels and sheets were strewn about and cigarette burns were all over the floors. Stolen from the trailer were all the canned food items, two quilts, silverware, butcher knives, towels, toilet articles, and a fishing tackle.

When Harris later received his telephone bill, he realized that several unauthorized long distance telephone calls had been placed from his trailer. Three of the unauthorized calls had been placed to a number in Springtown, Texas. These calls occurred on Sunday, June 19, at 3:51 a.m., 8:55 a.m. and 9:19 a.m. Two additional unauthorized calls were placed to a telephone number in Hopewell, Pennsylvania, at 4:00 a.m. and 9:19 a.m. The telephone number called in Springtown, Texas, was listed to Bryan Quintero, who is a brother of Derrick Quintero. The telephone number

called in Hopewell, Pennsylvania, was listed to a Barbara Vasser, William Hall's girlfriend.

At trial, Vasser testified that Hall told her during their first telephone conversation after the escape that his parole had been denied. Hall would not reveal to Vasser his and Quintero's location, but told Vasser that there were helicopters in the area searching for the escapees and that he and Quintero had been separated from Hudson and Montgomery.

Two knives taken from the Cherry trailer were found at Neal Foster's residence indicating that it was burglarized sometime after the Cherry and Harris trailers. Again, however, the burglary occurred sometime before 1:00 p.m on June 19, because Montgomery and Hudson had in their possession a gun which had been stolen from the Foster residence when they were apprehended.

However, Foster did not discover the burglary until Tuesday, June 21. The residence had been ransacked. Food was on a kitchen counter, deer steaks were in the microwave, and his binoculars were sitting on a kitchen counter. A green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol were on the floor of the living room. The hallway floor was littered with a Diet Pepsi can, a tin can of old coins, a notebook that once had old coins in it, some socks, a laundry basket with clothes that did not belong to him, and a pair of white tennis shoes that did not belong to him. Towels were strewn around the house. He found in his bathroom a pocket knife, towels, a pair of socks, a .22 caliber shell box, and a 20 gauge shotgun shell. The beds were unmade and had items spread on top of them. The master bedroom dresser drawers were open, and items were scattered all around the bedroom, including two walkie-talkies, a hacksaw, and a 12 gauge shotgun barrel. In the front bedroom, he found several hats, matchbooks, a jar of marshmallow cream, a box of graham crackers, and a small drinking glass.

In a walk-in closet in the residence Foster had kept a .22 caliber pistol, a Glenfield .22 caliber rifle, a Marlin .30-30 caliber lever action rifle, a 20 gauge shotgun, a single shot shotgun, and a Remington Model 1100, 12 gauge shotgun. Following the burglary, he found the 12 gauge shotgun lying on his bed. Someone had attempted to saw off the barrel and had rendered the gun inoperable. The 20 gauge shotgun was missing from his house, but a portion of the gun's barrel had been sawed off and left in Foster's bedroom. Also missing after the burglary were his .30-30 lever action rifle and ammunition for various weapons, including .30-30 accelerator rifle bullets, .30-30 caliber rifle shells, 20 gauge shotgun shells, and 12 gauge shotgun shells. In addition to the ammunition, several coins which Foster had collected, including silver dollars, were taken in the burglary.

The authorities found several latent prints at the Foster residence, and identified some of them as belonging to the escapees. A latent left thumb print matching that of

Quintero was found on a full box of Federal 12 gauge shotgun shells. A latent right ring fingerprint matching that of Quintero was found on another Federal 12 gauge shotgun shell box. A right middle finger and a right index fingerprint matching Blanton's print was found on a Federal field load 12 gauge shotgun shell box. A right palm print matching that of Quintero was lifted from one of the gun barrels. A latent right ring fingerprint matching that of Hall was lifted from a Diet Pepsi can.

Though the Crawford burglary was not discovered until after the Vesters' bodies had been discovered, a glove taken from the Crawford residence was found at the home of the murder victims, indicating that the burglary actually occurred before the murder. The Crawford residence was less than a quarter of a mile from the Vesters' home. John and Virginia Crawford had left their trailer, clean and orderly, around 2:00 p.m. on Sunday, June, 19. Following the burglary, they found their kitchen ransacked. Canned foods, crackers, and candy bars from the cabinet and refrigerator had been eaten. Prints were lifted from several items in the trailer. A latent left thumb print matching that of Hall was found on the bottom of a can of ham. A latent right index fingerprint left by Blanton was lifted from a Butterfinger candy wrapper found inside the refrigerator. The Crawfords identified two gloves found at the trailer, one white jersey and one brown jersey, as belonging to Mrs. Crawford. A patch on one of the gloves had been sewn on by Mrs. Crawford. Mr. Crawford testified that a flashlight had also been taken from the trailer. One of the gloves found at the Crawfords' trailer matched a glove found outside the Vesters' front bedroom window. A fiber analysis of the two gloves indicated that they were likely originally sold together as a pair.

With respect to the timing of the murder, the proof showed that late on Monday evening, June 20, John Corlew and Arthur Jenkins arrived at the Leatherwood boat dock, launched their boat, and night fished in the Leatherwood Bay. Between 11:00 p.m. and 12:00 a.m. they heard five gunshots emanating from the direction of the Vesters' residence. Corlew testified that he first heard two gunshots that were fairly clear, and after a pause, he heard two additional shots, another pause, and one final shot. Corlew testified that the first two shots and the second two shots sounded as if they were from different weapons. Mr. Jenkins testified that the two initial shots sounded like repercussions from a pistol. Both Jenkins and Corlew heard a total of five gunshots.

The victims, Buford and Myrtle Vester, were last seen alive around 6:00 p.m. on Sunday June 19 by their son Wayne. He, along with his twelve-year-old son, had arrived at his parents' home for a weekend visit on the evening of Friday, June 17. He had picked up groceries for his parents including Pepsi colas, lunch meat, bread, and milk. Wayne Vester left his parents home on Sunday, June 19, at approximately 6:00 p.m. At that time, the Vesters were alive and well. Wayne attempted, unsuccessfully, to reach his parents by telephone once on Monday, June 20, and twice on Tuesday,

June 21. Concerned, Wayne called their neighbor, Howard Allor, who lived approximately one quarter of a mile from the Vesters, but Allor had not seen them since the preceding Friday morning. When Wayne was still unable to reach his parents on June 22, he again called Allor and asked him to check on them. Allor drove to the Vesters' residence and discovered their dead bodies. He attempted to telephone the Sheriff from their residence, but the telephone was not functioning, so he returned home and reported the murders to the authorities.

David Hicks, Sheriff of Stewart County, was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation ("T.B.I.") conducted the primary investigation of the crime scene. The only entrance to the Vester residence was a screen door located at the side of the house opposite to the victims' bedrooms. The screen door had not been damaged. However, the front window was open, and the screen from the front window was lying on the ground near Myrtle Vester's bedroom window which was located at the back of the house. Underneath the front window was a concrete block which apparently had been taken from the front of a shed located at the back of the house. A cloth glove which matched a glove found at the Crawfords' residence was found on the ground beside the concrete block. An unopened Pepsi cola can lay next to the walkway to the screen door of the house. The packages of Pepsi cola that Wayne Vester had brought his parents were missing from the porch. The Vesters' maroon 1985 Pontiac Bonneville also was missing. The wires to the telephone connection box outside the Vesters' residence had been damaged and the line was dead. A live 20 gauge Federal shotgun shell with [a] number 6 bird shot was found lying near the electrical box. A spent 20 gauge number 4 shot Federal shotgun shell casing was found near the shed approximately 18 feet from Mr. Vester's back bedroom window.

The windows to the victims' bedrooms were located along the back of the house. Buford Vester's bedroom window frame was visibly bent. The screen covering the window had a hole in it which indicated that Mr. Vester was shot at least once from outside the house. Some [of] the glass louvers were broken, and shards of glass were found lying on the bed. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back, and blood was on both the pillow and the bed. Number 4 and 5 bird shot pellets were retrieved from Mr. Vester's room. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. A plastic shot sleeve, one shot shell, a plastic shot wad, and several shot pellets, all either number 4 or 5 bird shot, were recovered from Mr. Vester's body.

The victims were in separate bedrooms joined by a bathroom. Myrtle Vester's body was found lying in a pool of dried blood on the floor of her bedroom next to the bathroom.  Mrs. Vester had been shot three times, once with a 20 gauge shotgun, once with a high-powered rifle, and once again with either a shotgun or a high-

-8-

powered rifle. She also had been stabbed thirteen times. A copper-jacketed bullet was recovered from her body. Blood was found on Mrs. Vester's bed, and a considerable amount of blood was found on the bathroom floor. Blood was splattered on both the bathtub and the commode, and the bottoms of Mrs. Vester's feet also were covered in blood. The screen covering Mrs. Vester's bedroom window also had a hole in it, indicating that at least one shot had been fired from outside. The open and unbroken condition of the glass louvers indicated that the high-powered rifle or shotgun had been near the window when it was fired. Shot was sprayed all over the house, especially the kitchen. All of the shot pellets found in the house were either number 4 or 5.

On the victims' sofa authorities found a portion of *The Tennessean,* dated Monday, June 20, 1988. The local mail carrier testified that the victims did not receive *The Tennessean* by mail. A live 20 gauge shotgun shell with number 7.5 shot was found lying on the floor in the front bedroom next to a ransacked jewelry box.

Dr. Charles Harlan, the medical examiner, performed an autopsy on each victim and testified that the Vesters had died within two hours of consuming dinner. He stated that the victims had been shot a total of five times, and a minimum of three different weapons had been used to murder them.

Mrs. Vester had sustained three gunshot wounds. Gunshot wound A, located at the right portion of Mrs. Vester's chest just below her collarbone, measured approximately a quarter of an inch and was basically round in shape. This wound resulted when a copper jacketed bullet entered Mrs. Vester's body and lodged in her left arm. Wound B resulted from a shotgun blast and was located in the upper arm. This wound measured 3.4 inches by 1.8 inches, was jagged, with an irregular edge, and had multiple associated tangential abrasions. Wound C resulted from either a high-velocity rifle or shotgun. This gunshot blast had severed the two bones in Mrs. Vester's right forearm, leaving her hand and wrist attached to her body by a piece of tissue, consisting of only skin, muscle, and fat. Dr. Harlan could not determine the order in which these three gunshot wounds were inflicted.

Mrs. Vester also had sustained thirteen stab wounds, one to the middle of her back and twelve to her head, neck, and shoulder region. A majority of the stab wounds were inflicted to the left side of her head and neck. Dr. Harlan surmised that the puncture wounds were made by a squared object with a sharp edge, such as a kitchen or hunting knife. Two of the stab wounds severed her right and left common carotid arteries. The right carotid artery was 90 percent severed, and the left was 10 percent severed. Dr. Harlan testified that either the injuries to her carotid arteries or the gunshot injury to her right forearm would have been fatal. Dr. Harlan determined that Mrs. Vester could have survived the brutal attack for up to 15 minutes.

Mr. Vester had sustained two gunshot wounds. Shotgun wound A was located at the head and neck juncture. The total dispersal pattern of shotgun pellets was 13 inches. Wound A caused significant injury to his left lung, aorta, and pulmonary artery. Shotgun wound B was to Mr. Vester's right breast and caused trauma to his right lung and to his liver. Dr. Harlan recovered shotgun pellets and a shot column from Mr. Vester's chest and abdomen. Dr. Harlan opined that Mr. Vester could have survived from four to twelve minutes after sustaining the gunshot injuries.

On June 21, 1988, around 8 a.m., employees of the Memphis Funeral Home observed three men, in a maroon Pontiac which was later identified as the victims' car, enter the funeral home parking lot and park the car approximately 250 feet from the building. Two employees of the funeral home testified that one man got out of the front seat, took his tank top off, and put on three additional shirts. The two other men also exited the car. None of the witnesses could make a positive identification of the three men. The witnesses testified that all three men were white and about the same height, but two of the men were approximately 180 pounds and had darker hair. They stated that all three men had facial hair. One funeral home employee described the three men as having beards and stated that one had long hair.

The three men remained in the parking lot for approximately five to eight minutes. Then, after one of them took something out of the trunk, the three men walked towards a hospital across the street from the funeral home. One of the men turned, walked back to the car, and appeared to have placed an item back into the car. He then joined the two other men, and then all three walked away. The funeral home employees assumed that the three men were working on a construction project at the hospital. However, when the car had not been removed by Thursday, the funeral home employees contacted the Memphis Police Department.

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the Memphis Funeral Home. The police found a 1985 maroon Pontiac Bonneville in the funeral home's parking lot. The vehicle matched the description of the victims' vehicle. The keys were in the car's ignition. The officers found a sawed-off 20 gauge shotgun containing one live round under the floor mat behind the driver's seat which was later identified as the weapon stolen from the Foster residence, and as the weapon from which a spent shell found outside the Vesters' residence had been fired. Foster was able to identify the weapon by its serial number; however, the gun also had Foster's full name carved into it. The police also discovered under a floor mat a .30-30 caliber cartridge which matched ammunition that had been taken from the Foster residence. From a crumpled Budweiser beer can which also was found under the back seat police were able to lift three latent prints belonging to Blanton. No other prints were found in the car. The officer noted that the extremely hot temperatures in Memphis at the time the car was found made it difficult to lift intact prints. Other items retrieved from the vehicle

-10-

included a Ray-O-Vac flashlight, similar to one taken from the Crawford residence, electrical tape, thirteen 20 gauge shotgun shells, three 12-ounce Pepsi colas, one 12-pack of Pepsi colas, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988. The bus station, located in downtown Memphis was approximately one mile from the Memphis Funeral Home. His job was to prevent loitering at the bus station. Mr. Jones sat in a booth and observed people who came inside to determine whether they purchased tickets. Periodically, he would walk around and ask people whether they had tickets or if they were waiting for someone to arrive.

Mr. Jones recalled three men entering the bus station either Tuesday, June 21, or Wednesday, June 22, between 11 a.m. and 1 p.m. Two of the men sat down and watched television. One of the two seated men spoke to a man seated nearby. The third man, who had darker skin and appeared Hispanic, used a telephone. Mr. Jones approached the two seated men and asked them whether they had tickets. A man, whom he identified as Blanton, told him that they would leave as soon as their friend finished using the telephone. The three men remained in the station five to ten minutes. Later that same day, the Memphis police stopped by the bus station with a photographic line-up of the eight escapees. Jones responded that Blanton and Hall had previously been at the station. Later in the week, Jones spoke with T.B.I. Agent Stout. Jones identified Blanton and Hall from a photographic line-up and made an in-court identification of Hall as one of the men at the bus station.

The Blue Movies West adult bookstore and entertainment center was located across the street from the bus station. Shirley Denise Morrow testified that she worked as a cashier in the bookstore in June of 1988. On Tuesday, June 21, the day before her birthday, three men entered the bookstore around 9:00 or 10:00 a.m. Two of the men were white, and one appeared Mexican. The men traded a few silver dollars and half dollars for tokens. Morrow also purchased some of the silver dollars and half dollars for herself.

The men went to the back of the establishment to watch movies. Darlene Christof, a dancer at the establishment, testified that three "scruffy" men entered her booth on June 21. Two of the men were white, and the other appeared either Hispanic or Mexican. Ms. Christof informed the men that only one was allowed to remain in the booth. Two of the men left. From a photographic line-up, she identified the man who remained in her booth as Quintero. Quintero later gave her several silver dollars and tried to sell her a class ring and a man's wedding band.

The men then returned to the front of the establishment approximately fifteen to

twenty minutes later. They attempted to sell Morrow what appeared to be a class ring and a wedding band. Morrow declined and suggested they try a pawn shop. One of the men indicated that they did not have any identification and offered Morrow fifty dollars if she would allow them to stay in the movie house until their transportation arrived. Morrow declined their offer. Christof then came out from the back of the establishment and pretended to use the telephone. When Christof commented that the three men resembled the escapees from the Kentucky prison, they left. Morrow then contacted the police.

When shown a pre-trial photographic array of the eight escapees, Morrow identified Blanton, Quintero, and Hall as the three men who had visited the bookstore. Morrow turned over to the authorities the six silver dollars she had purchased from the men, and later, Foster identified the coins as those stolen from his residence. Morrow also made an in-court identification of both Quintero and Hall.

Lt. Thomas Pryor, an employee at the Eddyville penitentiary, testified that Quintero had long hair, a moustache, long side burns and a goatee prior to the escape. Lt. Pryor stated that he had never seen Hall with a beard.

Hall was eventually captured in El Paso, Texas. Both Blanton and Quintero were captured in Mexico near El Paso. Barbara Vasser, Hall's girlfriend at the time, testified that her mother called the Pennsylvania State Police after Hall called her for a third time following the escape. Afraid for Hall's safety, Vasser notified the authorities that she had agreed to wire money to him at the Western Union on North Stanton Street in El Paso, Texas. Hall was apprehended by agents of the Federal Bureau of Investigation ("F.B.I.") when he entered the Western Union in El Paso at approximately 2:20 p.m. on July 6, 1988.

On July 10, 1988, Quintero and Blanton were apprehended by Mexican officials at the Santa Fe Hotel in Juarez, located just across the border from El Paso, Texas, and transported across the international bridge. F.B.I. agents took custody of both Quintero and Blanton from Mexican officials at a border checkpoint. Found in Quintero's possession when he was taken into custody was an old wallet bearing an imprint of Neal Foster's driver's license.

Based upon the proof summarized above, the jury convicted both Hall and Quintero of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary.

During the sentencing phase, the State introduced proof that both Quintero and Hall had previous convictions for crimes involving the use or threat of violence. The State showed that Quintero had been previously convicted of two charges of escape in the first degree and one charge of first degree robbery. The State also presented proof

that Hall had previous convictions for two separate assaults, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice President of the United States of America.

Finally, the State introduced additional photographs and testimony concerning Mrs. Vester's body. Mrs. Vester was found lying in her bedroom just outside the bathroom. The State introduced photographs depicting the amount of blood on the bathroom floor and depicting the blood on the bottoms of Mrs. Vester's feet. The State also introduced a photograph of the front of Mrs. Vester's body to demonstrate to the jury the severity of her injuries and the brutality of the attack.

In mitigation, Quintero presented the testimony of his uncle and aunt, Paul and Josey Quintero, who said that Quintero's parents drank constantly. Quintero's father would stay away from home for long periods of time, and his mother had extramarital affairs. Quintero was hungry for love and affection when he visited his uncle and aunt's home. Paul Quintero testified that Quintero was always eager to seek his approval and never gave him any trouble. Quintero's parents did not discipline their children unless they were angry or drunk, at which time they would beat the children. Testimony also indicated that Quintero never had clothes which properly fit him, and as a result, he was ridiculed by the other children at school.

Paul and Josey Quintero testified that they had attempted to remain in contact with Quintero since learning of the criminal charges. They related that Quintero had obtained his GED in prison and was also enrolled in refrigeration and air conditioning classes. They believed that Quintero had improved himself and would make something productive of his life.

Quintero's cousin, Angela Alva, testified that she and Quintero were at one time very close. She also related how Quintero's parents had abused alcohol, and testified that Quintero had kept company with his older brother, Roderick, who was a bad influence and not a good role model. According to Alva, Quintero was a follower, and Roderick was aggressive.

A video deposition was shown of Helen Mimms Johnson, Quintero's first grade teacher. Johnson testified that Quintero was mischievous but never mean. He was held back a year and had trouble being attentive in class. Quintero was never very clean and always seemed exhausted when he came to school. Johnson never met Quintero's parents because they never attended any parent-teacher meetings.

Angela Holland and her 15-year-old son, Roderick Kent Quintero II, testified. Holland had been married to Quintero's brother for approximately three years. Holland and her son had maintained contact with Quintero and said that he had been influential in helping his nephew stay out of trouble.

-13-

In mitigation, William Hall presented the testimony of his older brother, Robert Hall, a prison minister. Robert said that defendant Hall was born in Paducah, Kentucky. Their parents divorced when defendant Hall was two years old. Their father worked on a barge and was gone for extended periods of time. Their mother died of throat cancer when defendant Hall was four, and at that point, Hall went to live with his father and stepmother. Hall's stepmother was at one time addicted to codeine.

According to Robert, the Hall children were not disciplined nor taught right from wrong but were sometimes beaten. Defendant Hall began getting into trouble in grade school. He began drinking alcohol in his pre-teens, and by his early twenties, he had begun abusing drugs. Robert testified that William Hall was a follower, not a leader.

For a time following his parole in 1982, defendant Hall had lived with Robert and his wife Ester in Pennsylvania. He worked with Robert at a tire shop and attended church with Robert and Ester. Robert testified that Hall had turned to God and changed his life. Hall lived with Robert and Ester for eight months. Hall, however, later moved into a trailer near his place of employment and began drinking. Eventually, he returned to Kentucky. The last time Robert and Ester had seen Hall was at his stepmother's funeral in 1987. They speak with him weekly by telephone, however.

Barbara Vasser also testified. She had met Hall when he had lived with his brother in Pennsylvania. Vasser said that Hall's life had changed after he accepted Christ. She and Hall were engaged but never set a date because Vasser was only seventeen years old at the time. Vasser testified that she and Hall were friends off and on between 1982 and 1988. Vasser said she had assisted the authorities because she had been afraid for Hall's safety. Vasser had not remained in contact with Hall after his apprehension.

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt and a clinical psychologist, testified that he prepared a psychological evaluation of Hall in 1991. He testified as to the background information conveyed by Hall during the interview. Hall grew up in Paducah, and his formal education ended after the ninth grade. He later earned his GED while incarcerated. Hall began using drugs and alcohol at age eleven and was addicted to Valium by age fourteen. He was placed in juvenile detention several times and was sent to a youth development center. Hall worked at different jobs while a young adult, but he had mostly been in and out of prison since age seventeen. Hall informed Dr. Anchor that he had experienced two head injuries. He fell off a porch as a baby and was struck in the head with a baseball bat when he was fourteen.

Dr. Anchor testified that Hall was cooperative and responsive during the interview. Hall did not offer any excuses or attempt to blame others. There was no indication of malingering. Moreover, Hall was enthusiastic about his plans to pursue college

courses in computers and data processing while incarcerated.

Hall scored a 99 on his I.Q. test which placed him in the 48th percentile. Dr. Anchor testified that although Hall has a reasonable amount of intelligence, he has some difficulty utilizing it. Hall experiences cognitive interference which is frequently seen in people who have habitually abused drugs and alcohol. Dr. Anchor found Hall's judgment, reasoning, and problem-solving skills to be "unstable." According to Dr. Anchor, that finding is consistent with a history composed of head injuries and substance or polysubstance abuse.

Dr. Anchor concluded that Hall is seriously maladjusted and suffers from organic personality syndrome. Dr. Anchor stated that persons with test profiles similar to Hall's usually have a strong sense of worthlessness and inferiority. Hall feels a deep sense of shame, embarrassment, and humiliation for many of his past actions. Dr. Anchor opined that Hall's psychological maladjustment can be treated effectively with counseling or psychotherapy. At the time of trial, Dr. Anchor stated that Hall did not present a danger either to himself or to others in a prison setting. Dr. Anchor opined that Hall's prognosis was good assuming he abstained from future substance abuse. Dr. Anchor concluded that the prospects for social, educational, and vocational functioning were satisfactory.

In rebuttal, the State presented the testimony of Dr. Samuel Craddock, a clinical psychologist at Middle Tennessee Mental Heath Institute. Dr. Craddock interviewed Hall and disagreed with Dr. Anchor as to the degree of danger Hall poses. Dr. Craddock further testified that he had not seen any data to support a finding that Hall suffered from an organic personality syndrome.

Based upon this proof, the jury found five aggravating circumstances which were not outweighed by the mitigating circumstances and, therefore, sentenced the defendants to death for the murder of Myrtle Vester and to life imprisonment for the murder of Buford Vester.

Hall, 976 S.W.2d at 124-32.

### Post-Conviction Evidence

Ronnie Cauthern, an inmate on death row in Tennessee, knew James Blanton prior to his death in 1999. Cauthern testified to statements Blanton made to him about the crimes in this case. According to Cauthern, Blanton told him that Hall and Quintero were not present when Blanton killed the victims. Blanton said "if anything were to happen regarding the execution of [Hall and Quintero], he would step up and stop it." However, he also said he would not say anything "at that time, because it would jeopardize his own case." Blanton had previously been convicted of murder, and according to Cauthern, he bragged about the killings.

Terry Lynn King, another death row inmate, also testified that Blanton told him Hall and Quintero were not present when the murders took place. Blanton "was somewhat troubled of [sic] whether he was going to testify at [Hall and Quintero's] post-conviction hearing," but when King informed Blanton that would be his only opportunity to help Hall and Quintero he decided he would testify on their behalf. According to King, Blanton "felt really bad" that Hall and Quintero were on death row for something he did.

King described the crimes as told to him by Blanton. Blanton, Montgomery and Hudson thought they had been spotted after breaking into a trailer, so they went to tell Hall and Quintero what happened. Hall and Quintero had set up a separate camp from the other three escapees. Quintero told Blanton they were going to meet his friend, Zach, later that night. After Blanton and the other two thought they had been seen breaking into a trailer, all five of the escapees broke into another home looking for guns and more supplies. Blanton told King that Quintero sawed off a shotgun, but that they all fled the house when they thought they saw a police officer. Hall did not have a weapon in his hands when they fled, but Quintero had a rifle. Quintero and Hall ran off in a different direction than Blanton, Montgomery and Hudson. Later that night, Blanton, Montgomery and Hudson tried to stop a couple of cars on a roadway but eventually ran off into the woods after they saw a patrol car.

The night after all five escapees fled from the house where they stole the guns, Blanton went to the location where Quintero said they would meet his friend Zach. Zach eventually appeared and told Blanton that he drove Quintero and Hall to meet Quintero's father in Nashville earlier that day. Zach asked Blanton where the other two were, Montgomery and Hudson, and Blanton told him how they became separated after seeing the police car. Blanton asked Zach for a ride out of the area, but Zach was reluctant to aid Blanton. However, Zach apparently told Blanton where he could find a car and some money to steal. Zach took Blanton to the Vester's home. Blanton told King that the man "put up a fight" so he "had to kill him." Zach was with Blanton at the time, but Blanton did not explain Zach's role in the murders, if any. Blanton rendezvoused with Hall and Quintero in Memphis at the bus station, which was their plan if they became separated.

King testified that he did not know Zach's last name. During his testimony, King referred to "these people's house," but he only mentioned that a man was killed. He never mentioned a woman having been killed. Nor did he mention the number or type of weapons used. King stated that the only information he received about the facts of this case came from Blanton. He testified he never read the appellate court opinions. King also testified that he never talked to Cauthern about the matter.

Kathleen Bernhardt had an encounter with Quintero and five of his fellow escapees in a church in Kentucky on Thanksgiving in 1983. Bernhardt was by herself practicing the piano when Quintero and the other men entered the church. Bernhardt testified that one of the men approached her from behind and held a rag over her mouth. However, she said Quintero shook his head at the man indicating to him to remove his hand from Bernhardt's mouth. The men took some food from

the refrigerator and asked Bernhardt for the keys to her car. The men tied her to a chair. She testified, however, that none of the men treated her with disrespect. The men left a little money for the food and asked Bernhardt not to call the police until an hour after they were gone.

Jo Hall, a juror in the trial of this case, testified that her husband was the sheriff in Humphreys County from 1976 until 1980. However, she testified that this fact did not have any bearing on her decision as a juror. She stated that the facts introduced at trial surrounding the killing of Mrs. Vester was the predominant reason she voted for the death penalty. In deciding to vote for death, Hall stated she did not make a distinction between the two appellants' roles in the murders. Hall recalled that defense counsel attempted to place the blame on another individual, but Hall believed the evidence cleared this individual. She could not recall a particular name, but she testified that the name Zach Pallay sounded familiar.

The deposition of Celerino Quintero, appellant Quintero's father, was read into evidence. Mr. Quintero was unable to travel to Tennessee because of his medical condition. Mr. Quintero had lived at the same address in Spring Town, Texas since 1981 or 82. In the early morning hours on Sunday, June 19, 1988, Mr. Quintero received two calls from Hall. During the first call, Hall asked Mr. Quintero if he had seen his son in the last day or so. Hall stated that he and Quintero became separated. During the second call, Hall stated that he had since found Quintero. When asked why his son did not call him instead of Hall, Mr. Quintero testified he did not know. Hall did not say where Quintero was when Hall made the phone calls. During the second call, Hall stated they had escaped from prison and asked Mr. Quintero to meet them at "the old truck stop in Nashville." Mr. Quintero left Texas that morning at approximately 8:30 a.m., drove about fourteen hours and arrived at the truck stop around midnight. Mr. Quintero fell asleep after he arrived, but was awakened before sunrise Monday morning by his son, Hall and Zach Pallay.

Quintero told his father they had to meet someone at the Greyhound bus station in Memphis. Mr. Quintero insisted that he drive them to Memphis, rather than Pallay. Mr. Quintero did not think much of Pallay because of things that happened when his son and Pallay were younger. When Mr. Quintero asked his son why Pallay drove them to Nashville, Quintero said there was no one else he could call and he did not want Mr. Quintero to be seen in the Leatherwood community with Texas license plates. When they arrived in Memphis, Mr. Quintero dropped off the appellants about seven or eight blocks from the station. Mr. Quintero wanted to take the appellants back to Texas with him but they informed Mr. Quintero they were supposed to meet someone in Memphis.

Mr. Quintero did not learn of the murders until after he returned home to Texas. Mr. Quintero testified he was never contacted prior to trial by either of the appellants' attorneys or investigators. According to Mr. Quintero, though he would have testified on his son's behalf, his son was adamant that he not get involved in the matter. Although he knew a trial was scheduled, Mr. Quintero stated did not know the actual date of the trial. Mr. Quintero admitted that his son contacted him numerous times from prison after he was arrested for the murders in this case.

Appellant Quintero testified on his own behalf at the hearing. He had previously been convicted of armed robbery in 1979 and two separate escape charges in 1983 and 1984. Quintero did not testify at the trial in this case, and he stated the decision was not his but rather a "unilateral decision" made by his attorneys. According to Quintero, his attorneys never discussed with him the option of testifying. Based upon his previous experiences testifying at trials, his other attorneys would not prepare him in advance but would simply call him to the stand during trial. Quintero said he was surprised when his attorneys did not call him to testify before the close of evidence. Quintero testified that the sheriff was administering cold medications to him at jail during the time of the trial. He further testified this medication made him groggy during the actual trial and he did not realize until it was too late that his attorneys rested their case.

Quintero testified that his attorneys only visited him twice in prison prior to trial. Quintero testified his attorneys informed him they could not receive collect calls from him in prison due to office budget concerns. He stated that he spoke with his attorneys on the phone approximately ten times. He said his attorneys attempted to convince him to plead guilty and testify against Hall and Blanton in exchange for a life sentence. His attorneys apparently told him that the evidence against him was overwhelming. However, according to Quintero, they never informed him of the date or time of the murders as known by the prosecution or asked him whether he had an alibi.

Quintero assumed his attorneys would be in contact with his family, and he was surprised to learn that they did not call his father. Quintero acknowledged, however, that a mitigation specialist interviewed his family. He claims the only investigation his attorneys were doing was related to mitigation, not the guilt phase of the trial. Quintero testified his attorneys told him that the budget concerns of the office prevented them from investigating the case personally, so they had to rely on the investigation of Hall's counsel. Quintero told his attorneys about the facts surrounding the Bernhardt incident, but they did not investigate the matter. The appellant told his attorneys Pallay was lying when he testified at trial that he knew Quintero since he was six years old because, according to Quintero, Pallay did not meet Quintero until 1979. However, Quintero said his attorneys did not respond.

Quintero testified that he respected the elderly, and that he would not have harmed the victims in this case. He said, "I'd probably shoot whoever was trying to shoot her [Mrs. Vester]." When they first arrived in the Leatherwood community, which was a retirement community, Quintero instructed the other escapees not to harm anyone because the police "would never stop looking for us." If he had testified at trial, Quintero stated he would have emphasized that he would not have hurt the victims in this case. If he encountered anyone during the burglaries which were committed, he stated he would have tied them up like he did Ms. Bernhardt.

Quintero recounted the events surrounding his escape from prison in Kentucky, as he would have testified at trial. Although Quintero was getting close to his parole date, he decided to join the escape. When asked why he would do such a thing, he did not have a good response. Quintero had between five and six hundred dollars on his person. Accordingly, he stated there was no reason for him to hurt anyone over money. Quintero believed he was the only escapee with any money. Prior

to the escape, he obtained new clothes and some food and had his hair and beard cut. He knew Blanton was in prison for murder prior to their escape. And he also knew that Blanton and Hall did not get along. Quintero stated that he, Montgomery and Hudson were "partners" and that after the escape the three of them planned to stick together. However, five of the escapees, Quintero, Hall, Blanton, Montgomery and Hudson, ended up stealing a truck together.

Quintero thought they were heading to Missouri after they stole the truck. He stated he was surprised to learn they wound up in Clarksville, Tennessee. Quintero grew up in Clarksville, and he was afraid someone might recognize him. He decided they should travel to the Leatherwood community because it was a wooded area and he knew Zach Pallay lived there. He met Pallay in 1979 shortly before they were both convicted of robbery. The five escapees hid the stolen truck in the woods and then looked for an unoccupied trailer or cabin to break into for food and camping supplies. Quintero testified they broke into the Harris trailer around noon on June 16, 1988. Inside the Harris home, the five escapees cooked food. Someone took a shower. After about an hour, they took some supplies and returned to the stolen truck.

After nightfall on the 16th, Montgomery, Hudson and Blanton left the campsite while Quintero and Hall stayed behind. The three men returned to the campsite about two hours later with more supplies they stole from the Cherry residence, which was next door to the Harris' home. Quintero testified he never went into the Cherry residence. Quintero became upset with Montgomery for unnecessarily breaking into the Cherry residence and possibly drawing attention to their presence in the area. When Quintero awoke the morning of the 17th, he and Hall decided to leave the other three escapees because of the animosity that developed between Quintero and Montgomery. Quintero found a spot near a pond to set up a new camp. He testified it was near the marina Pallay's parents managed. It was during this time that Quintero suggested to Hall they try to make it to Mexico. Quintero decided to try and contact Pallay to ask him to drive them to meet Quintero's brother in Nashville or Memphis. He remembered Pallay liked hanging around that same pond back in 1979.

After sunset on June 17, 1988, while Quintero and Hall were at the new campsite, they saw Pallay near the pond drinking beer and smoking a joint. Quintero introduced Hall to Pallay and mentioned the fact that there were three other escapees nearby. Pallay learned about the prison break from the media coverage. Pallay agreed to meet Quintero and Hall at the pond the following night, Saturday, June 18, 1988, and help them get to Memphis to meet Quintero's brother, Brian. There was a contingency plan for them to meet Sunday night, the 19th, if Pallay did not show on the 18th.

The other three escapees showed up at Quintero and Hall's campsite Saturday afternoon and informed Quintero and Hall that the three of them had been spotted by a fisherman. The three escapees brought their supplies with them, and all five men hid their combined supplies in a ravine near Quintero and Hall's campsite. Quintero stated the five escapees then ran into the woods and came upon the Foster residence. Quintero testified they were looking for guns because they thought the police might be looking for them at this point. When asked why he needed a gun, Quintero stated: "Because I was . . . being hunted. And I was going to escape. You know, I was at war. I had

- You know, this gets in my personal political beliefs, but I didn't have a problem with the people, society in general. I was at war with the - with the government. You know, the police administration. That's what promulgated all of the escapes, you know, the result - my mistrust of authority and the abuse of authority and - and those kinds of things." Quintero testified he would have no qualms shooting a police officer who was aiming a gun at him.

After they broke into the Foster house, Quintero learned for the first time that the other three had previously broken into the McMinn house. According to Quintero, that's where the other three escapees were spotted by the fisherman. Inside the Foster house, Quintero grabbed a 12 gauge shotgun and sawed off the barrel. However, he stated he rendered the weapon inoperable when sawing off the barrel. He also sawed off the stock and barrel of a 20 gauge shotgun which Blanton gave him. Quintero testified he wore brown jersey gloves while handling the guns and suggested to the other men they should do the same. Quintero stated Hudson and Montgomery grabbed a .22 caliber rifle and a .30-30 caliber rifle. Hall did not take a gun. Quintero told Blanton that he and Hall still planned to escape to Mexico and he provided Hall and Blanton with his parents and uncle's phone numbers in case they became separated again. Quintero told Blanton the plan was to meet in Memphis at the Greyhound station. While inside the Foster home, the escapees drank some sodas and cooked and ate some food.

Quintero testified he looked out the window of the Foster house and saw a sheriff deputy's car pull into the driveway. He yelled "police" and all five men fled. On the way out of the house, Quintero grabbed a .22 caliber rifle and a box of ammunition. Quintero testified he ran off into the woods and stayed there by himself Saturday night, the 18th. He did not meet Pallay that night as planned. The next morning, Sunday the 19th, Quintero stated he went to find Hall at their rendezvous spot. After he met back up with Hall, Quintero hid the .22 rifle in a drainpipe. He testified that he did not believe he would need the gun any more because he had not seen any other law enforcement officers after leaving the Foster home. He stated the reason they went looking for weapons in the first place was because the other three men said they had been spotted by someone.

Quintero and Hall met with Pallay Sunday night, the 19th. Pallay told them he would be back to pick them up the next morning, Monday, June 20, 1988. Quintero and Hall hid in the woods Sunday night. Pallay showed up the next morning in a red and white pickup truck which had a camper-top attached to the bed. They arrived in Nashville around dawn on Monday, June 20. Quintero testified that Hall had telephoned Quintero's father from the Harris residence on June 19, and Quintero's father told Hall he would drive to Nashville to meet them. According to Quintero, his father is the one who decided they should meet in Nashville. "Pop took charge of that, you know. . . And he said, come to Nashville, rather than go to Memphis like we had originally planned. You know, it was - Basically, I was just going to let him - touch bases with him and, then, continue on to Memphis." Quintero testified that his father, not Hall, suggested meeting at the truck stop in Nashville.

According to the plan they devised with Blanton, Quintero and Hall would wait for him for two days in Memphis. Quintero testified that by the time they arrived in Nashville he had four days

worth of growth on his beard. He also testified that Hall looked clean-shaven because of his inability to grow facial hair. Quintero stated that the sun had risen by the time they arrived in Nashville. Although Quintero planned to have Pallay drive him and Hall to Memphis, his father insisted on driving them because of his distrust of Pallay. Quintero stated he was worried about getting his father involved. However, he testified his father knew nothing about the murders at this time. They arrived in Memphis at approximately 11:00 a.m. Quintero testified his father drove them past the Greyhound station and dropped them off about a half mile away in a homeless park. Quintero testified that he placed a phone call to Texas from the bus station on the 20th. He told the person who answered the phone to let his brother, Brian, know that he would call him back in the next day or so.

Quintero testified that they met Blanton at the bus station at 10:00 a.m. on Tuesday, June 21, 1988. Quintero said he called his brother again from the bus station that day. After the security guard told them to leave the station, they went across the street to an adult oriented business establishment. When the employees of that business recognized who they were, they left and stayed in a nearby abandoned building off Beale Street. Quintero testified they inquired about work at a carnival in town so they would fit into the crowd. At some point, they were confronted by the police near the carnival. The officer said they fit the description of the three escapees, but they informed the officer they were carnival workers and he let them go. Quintero testified he called his brother again the night of the 22nd from an oyster bar on Beale Street. His brother drove to Memphis the next day, June 23, 1988, to pick up Quintero, Hall and Blanton.

On cross-examination, Quintero testified he did not tell his trial attorneys his version of the facts. Instead, he "wanted to hear what they had to say." When asked whether he informed his attorneys about his alleged alibi, Quintero testified he did not because "they got me to a point I just didn't trust them anymore. I didn't have no faith in them, the system." When questioned further, Quintero stated neither of his attorneys ever asked him if he had an alibi or anything else about the case. In response to the question, "So you made a conscious decision not to tell your lawyers about this alleged alibi," Quintero responded, "Well, I guess - I guess it boils down to that; yeah. A stupid decision, I guess, but it was - it was conscious, I guess." According to Quintero, neither he nor his attorneys knew the actual date or time of the murders.

Quintero stated that mitigation was the only matter in which his attorneys were interested. He said he cooperated with his attorneys in that respect. Although he stated he was not interested in the mitigation aspect of his case, Quintero believed he should assist his attorneys in gathering information about his background. He assumed investigation into the actual facts of the case was being done independently by his attorneys. Quintero testified he had a better rapport with the mitigation expert in his case and that he was thus able to better communicate and provide information to him. He said he adamantly communicated to his attorneys that he did not kill the victims.

Quintero testified he has read a transcript of the evidence from his trial. Quintero was subpoenaed to testify in Blanton's trial, but he stated his attorneys advised him not to testify. According to Quintero, he did not see Blanton again after June 18, 1988, until they met in Memphis.

Quintero first told someone about his alibi in 1999 when he filed the instant post-conviction proceeding. When asked why he sat next to his attorneys at trial for seven weeks and not once tell them he was not present on the date the murders occurred, Quintero responded that he "never did really understand when the Vesters were killed." Quintero testified he remembered trial testimony from the fishermen who heard gunshots the night of June 20, 1988, as well as evidence that the Vesters' newspaper, dated June 20, 1988, was found inside their house. However, when questioned on cross-examination, "And that didn't strike you as, hey, wait a minute, I wasn't there," Quintero did not respond.

Quintero testified on cross-examination that he stole the gloves he was wearing from the garage of the Foster house. Quintero testified he never went into the Crawford home. When asked whether his testimony, that he would not hesitate shooting an officer who pointed a gun at him, would have "won you points and favors in front of the jury," Quintero stated that his comments about that "didn't have anything to do with what I was on trial for."

Quintero stated he did not call anyone in his family from the Leatherwood community and he stated he did not direct Hall to call anyone. He testified that his parents and brother Brian lived in separate residences on the same property in Texas, and that his parents did not have a telephone at that time. Quintero testified about his prior record, which included one guilty plea for armed robbery and two convictions following jury trials for escape, and acknowledged that he "had pretty good experience - or a lot of experience - in court in the criminal process" and was familiar with his rights.

Appellant Hall also testified on his own behalf during the post-conviction hearing. Hall was represented by Attorneys N. Reese Bagwell and Jennifer Roberts at trial. Hall testified that he did not meet with Roberts until the arraignment, which occurred almost a year after she was appointed to represent him, and that Bagwell was not present. According to Hall, Roberts did not meet with him again until six months later. Hall stated that Roberts did not have any capital case experience at the time of her appointment in his case. He further testified that he independently met with each of his attorneys approximately four times prior to trial and two times together. Hall's impression of his attorney's responsibilities was that Bagwell took charge of the case while Roberts "was there to talk to me and keep me company." According to Hall, on more than one occasion Bagwell asked the court to relieve him as counsel because his law practice was suffering financially due to the amount of time he was spending on Hall's case.

Hall remembered accompanying his attorneys to the T.B.I. facility to view the evidence. Hall remembered Bagwell informed him they believed that the murders occurred between June 18 and 22, 1988. Hall testified that neither of his attorneys discussed with him the possibility of an alibi defense. Hall further testified that he did not learn that the victims were murdered on June 20th until he read the supreme court's opinion. Hall testified that he was in Nashville on June 20, 1988. Further, he confirmed the testimony of Quintero detailing their escape, the time they spent in the Leatherwood community, as well as their trips to Nashville and Memphis. Hall testified that he did not arm himself after they broke into the Foster residence.

When his counsel asked why he did not inform his trial attorneys about his possible alibi, Hall testified he did not know when the victims were murdered. Hall said he questioned Bagwell why he was not charged with the burglary of the Crawford residence even though the can of ham with his fingerprint was found there. Bagwell mentioned to him "something about a movable object theory" which Hall stated he did not understand. Hall told his attorneys he did not burglarize the Crawford residence. He also informed them he did not kill the victims, burglarize their house, or steal their car. Hall testified he was never in the Vesters car. Hall also testified he cannot grow a full beard.

Hall testified that Bagwell discussed with him the option of testifying, but that Bagwell ultimately concluded it was not a good idea. Hall stated he did not realize the ultimate decision about whether or not to testify was his; he trusted Bagwell and "figured he knew what he was talking about." Hall knew if he testified his criminal record would be placed into evidence, and he testified at the hearing below that he did not want his record before the jury. However, Hall testified that Bagwell never informed him there were ways to possibly limit the questions the prosecutor could ask about his past crimes or soften the impact evidence of his previous convictions would have on the jury. According to Hall, Bagwell told him "things were under control" and that Hall "didn't have nothing [sic] to worry about." Bagwell informed him the prosecutor did not possess any evidence implicating Hall for the murders, however, he told him the telephone call to his girlfriend and his fingerprints would be damning evidence of the burglaries.

During cross-examination, Hall acknowledged having prior experiences with lawyers and the criminal justice system. Hall testified he was previously involved in at least five criminal court proceedings. Hall's attorneys moved to sever his case from Blanton. As part of the motion, Hall signed an affidavit stating that he and Blanton were separated on June 18, 1988, and that he would not testify if called as a witness in Blanton's trial. Hall testified that after the escapees fled the Foster residence on June 18, 1988, he went back to the abandoned truck and subsequently broke back into the Harris home. Hall stated he called Quintero's father early the next morning to ask if Mr. Quintero had heard from his son. He testified Mr. Quintero was asleep during the first call so he agreed to call back later in the morning. Hall also telephoned his girlfriend in Pennsylvania. He stated he left the Harris house after daybreak and found a spot to hide out in the woods near the pond where he and Quintero were to meet. Hall said Quintero met him sometime around dark later that day.

Hall reiterated on cross-examination that he did not realize he had an alibi because he did not know when the murders were committed. He stated he did not remember the fishermen testify that they heard gunshots the night of June 20, 1988. Hall testified he did not pay attention during much of the testimony at trial because he was either talking to Attorney Roberts or tired after talking all night to fellow female inmates. When questioned whether it was his choice not to pay attention during trial, Hall stated, "Well, I was - I don't know if it was much of a choice, I just - I got - I was doing something else."

-23-

One of the jurors testified he remembered seeing the two appellants brought into the courtroom in shackles. Another juror testified the jury could not determine for which murder each appellant was responsible. This juror also testified that the inmate barber who testified about the appellants' haircuts and facial hair lost credibility when he acknowledged wanting to change his name to "Oogateeboogatee." Another juror testified that evidence about Quintero's encounter with Ms. Bernhardt, where no violence occurred, "probably would have" made a difference. However, on cross-examination, this juror also stated evidence about Quintero's previous escapes would have influenced his decision to vote for the death penalty.

Attorney Jennifer Roberts graduated from law school and was licensed to practice law in 1987. She was appointed in December 1989 to represent appellant Hall in this capital murder trial. Roberts testified that this was her first murder trial; she believed she was not qualified to serve as either lead or co-counsel. Roberts filed a motion to withdraw from the case. The trial court, however, denied the motion and appointed qualified counsel to assist. The fee claim she submitted for compensation in this case totaled $16,335.00. Roberts testified that she lost money in her regular practice due to the amount of time she devoted to this case.

Roberts testified that Reese Bagwell was lead counsel and that she considered her role as "a gopher-type, doing what I was told." Roberts identified several motions for expert services prepared by Bagwell and she acknowledged that the certificate of service reflects that copies were forwarded to the prosecutor and counsel for Quintero. Roberts drafted the initial motion for new trial. She testified that she began experiencing "communication problems" with Bagwell after the conviction and she later learned that a motion for new trial had not been filed despite the looming deadline. She received a copy of the motion filed by Quintero's attorneys and copied some of the issues they presented. Roberts stated she did not undertake an independent review of the transcript of evidence to identify issues which pertained to Hall.

During the preparation of the brief on appeal to this Court, Roberts testified that Bagwell did not maintain contact with her. "I just assumed that Mr. Bagwell had a vast amount of experience in this and tried a wonderful case, in my estimation, and I thought that he was handling it." However, Roberts testified that approximately two days before the brief was due Bagwell contacted her and asked her to prepare the brief. Evidently, though Bagwell received extensions on the due date and informed Roberts she did not have to worry about anything, Bagwell was not working on the brief. Roberts recalled that this Court ordered Bagwell to appear before a panel to show cause why he should not be held in contempt for failing to timely file a brief. Bagwell ultimately filed a brief that was a copy of the one prepared by Quintero's attorneys. Roberts testified that a number of the issues Bagwell included in the brief were not relevant to their client's case. Roberts prepared and filed the appellate brief in the supreme court. Again, Roberts testified that Bagwell was supposed to prepare the brief, but she discovered near the due date that it had not been filed and Bagwell failed to respond to her communications. She stated she did not have sufficient time to do any independent research so she merely assimilated in the supreme court brief those issues which were filed in the brief before this Court. Roberts did not claim compensation for work on appeal because she "didn't do anything."

-24-

Roberts testified that she attended portions of Blantons trial, which occurred before the trial in this case. She did not remember filing a bill of particulars or a notice of alibi on behalf of Hall. Nor did Roberts remember discussing with Hall the State's request for a notice of alibi. However, Roberts stated she gained knowledge about the State's theory on the time of death from Blanton's trial. Roberts testified that the defense theory at trial was to attempt to highlight the State's inability to prove which defendant killed which victim. Roberts did not remember whether Bagwell directly asked Hall if he had an alibi.

Roberts did not recall discussing with Bagwell whether or not they should challenge the medical examiners opinion regarding how long the victims survived after the infliction of the wounds. Roberts testified she was surprised when Ben Spencer, who testified about the length of the appellants' hair, stated during cross-examination in court that he had changed his name to "Oogateeboogatee." She agreed that Spencer's credibility was lost at that point. However, Roberts did not remember discussing the need to call a dermatologist or other expert. Roberts remembered Hall being in leg shackles during trial, but she stated his hands were not cuffed and they attempted to make sure his legs were hidden from the jury's view.

Roberts testified that Hall "was not real keen on the fact of having anybody involved" in his trial, but she stated that Hall "would have been the one that [sic] would have told me about" asking his brother to testify at sentencing. Roberts also testified that she had the primary responsibility of securing and questioning the expert witness during sentencing.

Roberts testified on cross-examination that she was able to gain advice from her law partners, who were more experienced attorneys and had tried capital and non-capital murder cases, throughout the duration of her representation in this case. She also testified that she did not claim compensation for all of the work she actually performed. Roberts testified they had three days of motion hearings before trial, and the trial lasted six weeks and two days. She stated that the trial "was absolutely excruciating for [her] and everybody else that was involved in it."

According to Roberts, neither defense team was surprised at trial by the testimony of the fishermen who heard gunshots on the night of June 20, 1988. She believed she was even aware of that fact before the Blanton trial. Roberts stated they were provided open-file discovery by the prosecutor; "In going through it, I didn't find anything that y'all had that we didn't have." Roberts also obtained a synopsis of the proposed testimony of all of the State's witnesses prior to trial, even though she testified that "I don't think that y'all intended for me to get that stuff, but I got it nonetheless." Roberts testified it was unusual for the prosecution to allow defense counsel, along with the defendants, to view evidence and interview experts at the T.B.I. laboratory. Roberts also remembered her and Bagwell discussing with the trial judge, ex parte, the need for expert services. Roberts testified that, based on the fact that the trial was being held in rural Humphreys County, they did not see the need for a jury expert.

When Roberts was asked what she could have done differently in this case, she responded, "At the beginning, I don't know of a lot that I could have done different." But in retrospect, Roberts stated she would have taken more of a lead "rather than sitting back" and "using it as a learning experience." She admitted, though, that her strategy might have been different given the fact that the end result after a six week trial was not favorable. Roberts testified that hindsight is always twenty-twenty. Roberts also stated that she could have taken more of an active role in the appellate briefing process. According to Roberts, Bagwell had an impeccable reputation and was a very competent trial attorney. Roberts stated that she never had any problems communicating with Quintero's attorneys.

Roberts testified that she met with Hall several times prior to trial and that she was always available for him to call. When Roberts was questioned during cross-examination whether Hall ever mentioned a potential alibi, the following exchange took place:

Prosecutor:     Okay. He never mentioned anything about an alibi?

Roberts:        The conversations that I had with Mr. Hall concerning the facts and circumstances of this case were very limited.

Prosecutor:     Okay. Would he not cooperate?

Roberts:        Yes, he cooperated with everything that I asked him to do.

Prosecutor:     So, why they were limited?

Roberts:        I - that's something that he would have to - have to -

Prosecutor:     Well, I'm asking -

Roberts:        - respond to.

Prosecutor:     - you, now?

Roberts:        I don't know. I don't know why they were limited.

Prosecutor:     Well, would he cooperate with you?

Roberts:        Yes, sir. If I asked him -

Prosecutor:     Would -

Roberts:        If I asked him a question, he would answer it.

Prosecutor:     Okay.  But otherwise, he wouldn't volunteer any information?

Roberts:        No, sir, I didn't ask him to volunteer any information.

Prosecutor:     So he never told you about an alibi?

Roberts:        I - I don't recall that I asked him did he have an alibi.

Prosecutor:     No, my question was: Did he tell you that he had an alibi?

Roberts:        Not to my recollection that that was not a discussion that [Hall] and I ever had.

Prosecutor:     And why didn't you discuss that with him?

Roberts:        I don't know.  I - I - I - I hate to say it this way, but [Hall] took a lot of his cues and what information that he gave me from - from [Quintero].

Prosecutor:     Okay.

Roberts:        You know, they - he and - [Hall, Quintero and Blanton] had a - had a - At - At the very beginning, it's my recollection that they had a common plan that they wanted us to present.  And I got the information that [Hall] wanted me to get.  And - And we had a mutual understanding that I took what he gave me - the information that he gave me - and I didn't press him on - on the other issues.  It's - Like, with his family issues.  I mean, they're just - he - he wasn't forthcoming with information about his family.

Roberts never conducted an independent interview with Quintero.  Regarding the common plan that Roberts testified the three co-defendants maintained, even after Blanton's case was severed her impression was that Hall and Quintero "were not going to have any different story about the events that went on.  They had a common goal."  According to Roberts, if either Hall or Quintero had an alibi and the other did not, neither was going to "cross each other."  After Blanton's case was severed, Roberts discussed with Hall the possibility of severing his case from Quintero's but Hall "specifically said, no, do not do it."  Roberts testified they argued to the jury that, because there was evidence of so many different burglaries, there being no specific time-line established by the State, and no specific evidence who killed each victim, the State did not prove beyond a reasonable doubt that Hall was in the Vester's home versus burglarizing another house at the time of the murders.

Shipp Weems, District Public Defender for the 23rd Judicial District, was appointed to represent Quintero at trial.  Weems had been practicing law since 1976.  Weems testified that at the time of his appointment in this case he and his three assistants each carried an open caseload of approximately 800 cases each.  Weems was assigned to seven capital cases during that time.  Weems

-27-

had previous experience trying capital cases. Weems stated his office did not have the resources available to handle that many cases at once. Weems testified the court knew about his caseload, but he recognized it was his job to defend those cases. His office did not employ a separate investigator during that time, as that position was filled by another attorney due to the caseload. Weems remembered requesting services for an investigator in other capital cases, which requests were denied, but did not remember specifically filing a similar motion in this case.

Weems testified that he never spoke with Quintero's father. Although he stated that he would have liked to interview Mr. Quintero, he said the reason he did not was lack of time and resources. Weems believed he met with Quintero in prison more than two times prior to trial. Weems did not recall any conversations he had with Quintero about an alibi. Weems, however, acknowledged the procedure for filing a notice of alibi. Though he stated none was filed in this case, he also stated that this was something that would not have been ignored.

According to Weems, counsel did not investigate the facts or circumstances surrounding Quintero's previous convictions. In retrospect, he stated he would have been obligated to investigate that information. Acknowledging his office's budget concerns during the period of his representation of Quintero, Weems testified that his office did not accept collect telephone calls. Weems testified that budget restraints adversely affected his ability to adequately prepare his cases for trial.

Weems did not believe they presented a strong mitigation defense at sentencing. Weems testified that Mr. Quintero's testimony combined with the testimony of Ms. Bernhardt potentially could have made a difference in this case, which was based on circumstantial evidence. However, during cross-examination, Weems agreed that the prosecutor could have made the argument that, because Quintero was apprehended after tying up Ms. Bernhardt, he would not have made the same mistake again with the victims in this case.

Weems admitted that the prison barber's credibility was lost when he revealed his name change, but he also stated he did not think the court would have granted funding at that point in the trial for an independent dermatologist to testify on their behalf. According to Weems, even the State did not learn about the name change until they received documents from the guards from the Kentucky prison who transported the inmate to trial.

Weems remembered making a request for a fingerprint expert to evaluate the State's expert after the trial court apparently changed its mind and allowed the State's expert to testify. However, Weems also remembered that this occurred on a Friday during trial and the court only allowed them until Monday to obtain the experts services. According to Weems, they could not accomplish that. Weems raised the issue in the motion for a new trial but did not remember why he did not present the issue on appeal.

Weems testified that counsel for both appellants would normally meet the morning before trial to discuss issues, but he recalled that Bagwell usually arrived late. The mitigation specialist for

whom Weems received funding met with Quintero a number of times prior to trial. Weems did not call him as a witness because he was not satisfied with his work product. However, Weems did not believe the trial court would approve funding for another mitigation specialist. Weems testified they decided to leave the former sheriff's wife on the jury, despite her position on the death penalty, because they wanted independently thinking, educated women on the panel.

Weems stated that, although he did not necessarily ask all of his clients if they had an alibi, he would expect those who did to inform him of such. He never heard Quintero mention evidence of an alibi in this case. Weems commented on his defense strategy: "[B]ecause the case was circumstantial, we were basically employing the fact that they couldn't prove it beyond a reasonable doubt." After Blanton's case was severed, Weems advised his client it would be "a horrible, horrible mistake for him to testify at that trial." Weems identified the affidavit Quintero signed when Blanton's trial was severed. In the affidavit, Quintero stated that he did not see Blanton in Stewart County after approximately 11:00 p.m. on June 18, 1988. Weems testified, though, that he did not ask Quintero to provide him a time-line of his whereabouts between June 18 and June 22, 1988. Further, Quintero stated in the affidavit that he would assert his Fifth Amendment right not to testify at Blanton's trial.

Zachary Pallay testified at trial. Quintero called Pallay to testify at the post-conviction hearing. Pallay stated at the time of the crimes in this case he had shoulder-length hair, but no beard. Pallay believed at the time that he was a suspect for the murders. Pallay learned about the prisonbreak on the radio. He stated that if the appellants had come to his house he would have asked them to leave, and further stated he would not have hesitated shooting them if they did not comply. Pallay testified he knew the Vesters "very well." Pallay testified during the hearing that he did not see Quintero in June 1988, and he had never seen Hall before. He did not know when the victims died, and he stated that he did not drive Quintero and Hall to Nashville.

Danny Warren, Deputy Sheriff with the Humphreys County Sheriff's Department, transported the appellants to and from the jail during the trial. The appellants were transported in shackles. However, their handcuffs and shackles were removed before the jury entered the courtroom. Likewise, the appellants were placed back into their handcuffs and shackles at the end of the day only after the jury left the courtroom. Deputy Warren testified that the appellants were never escorted in handcuffs or shackles in the presence of the jury.

The State called Attorney Steve Stack to testify at the hearing. Stack was Weems' co-counsel for Quintero at trial. Stack tried two previous capital murder cases. Stack confirmed Weems' opinion about the mitigation investigator. Stack testified that he met with Quintero a number of times before trial. Stack also advised Quintero against testifying at Blanton's trial. Stack testified that he investigated the facts of this case. Stack remembered the appellants being restrained in shackles at the conclusion of the guilt phase of the trial.

The State called Attorney Roberts as a rebuttal witness. She testified about her involvement in numerous other major felony cases prior to her appointment in this case. During cross-

examination, Roberts testified they argued that the items on which Hall's fingerprints were found were moveable items that could have been brought to the scene after he touched them somewhere else. Roberts testified that during trial the judge changed his mind about the admissibility of the fingerprint evidence but permitted defense counsel to obtain an independent examination over a weekend. Roberts stated that any such examination in that short of a period of time was impractical. Though the issue was presented in the motion for new trial, Roberts stated the same was not raised on appeal because Bagwell simply copied Quintero's brief which did contain the issue.

Roberts testified that Bagwell presented a time-line to the jury during closing argument explaining that it was possible that Hall could have been burglarizing another home when the victims were killed. Roberts reiterated that Hall instructed his attorneys he did not want to implicate either Quintero or Blanton; "they were in it together and their stories were going to stay the same." As Roberts stated, attempting to place Pallay in Memphis together with Quintero and Blanton would have gone against Hall's directive to counsel. Although Blanton moved to sever his case from the appellants, Roberts stated that Blanton's attorneys recommended severance and Blanton merely heeded their advice.

Deborah Wolkhaner testified that she is a certified master social worker with a master's of science degree in social work, with a clinical concentration. After describing her training and experience, Wolkhaner stated that she had been retained by Hall during post-conviction to investigate potential mitigation evidence. She met with Hall on a number of occasions and spoke with his family in Kentucky.

Wolkhaner expressed her belief that the initial motion to withdraw filed by counsel contributed to a lack of trust between Hall and trial counsel. After obtaining a release, Wolkhaner obtained Hall's school records (elementary through completion of his GED), medical records from childhood through incarceration, birth records, biological mother's death records, and marriage and divorce records. She also reviewed records of Dr. Anchor and Dr. Craddock. She cautiously approached Hall and the family to gain their trust and confidence. Wolkhaner interviewed Robert Hall (appellant's brother), Barbara Hall (appellant's sister), Patricia Burton McNeill (appellant's half-sister), Barbara Cook (appellant's niece), Bob Steele (pupil personnel coordinator at the elementary school), and Tammy Tate. Her interviews with these individuals helped develop a picture of Hall's life. She was not able to locate Hall's father.

Wolkhaner testified that Hall's life revealed poverty, malnourishment, loss and abandonment, divorced parents, and instability in the home. His stepmother was addicted to heroin, Valium and codeine. Hall's life had a theme of alcohol and substance abuse. According to her investigation, at age fifteen Hall went to live with a lesbian couple who wanted him to father a child for them. On one of Hall's birthdays, a brother purchased a Valium for him.

During examination by Quintero's counsel, Wolkhaner agreed that evidence a person had passed up an opportunity to be violent to an elderly person would have supported the position that someone did not seek or provoke violence. She further described the purposes and benefits of a

mitigation specialist. On cross-examination by the State, Wolkhaner affirmed that her responsibility was to reveal Hall's problems. She stated that she attempted to check both sides of every story. Wolkhaner admitted she did not review documents about particular inmate incidents wherein Hall assaulted another individual. She further had no information about various incidents involving violence while incarcerated. Wolkhaner opined that Dr. Archer did an incomplete job because he only brought Robert Hall into the life cycle proof.

After much discussion about Hall's life and what Wolkhaner did or did not know, Wolkhaner testified that a thorough mitigation investigation could reveal evidence useful to the defense at the penalty phase of a trial. She said that while this type of evidence does not excuse conduct, it shows the jury that these social factors have effects on an individual's sense of self and their development.

Dr. Murray Wilton Smith, a medical doctor who specializes in addictionology, testified on behalf of Hall. During his career, he has treated approximately ten thousand patients who have problems with alcohol and drugs. He formerly ran the program at Baptist Hospital, but at the time of the hearing served as medical director at New Life Lodge in Dickson, Tennessee.

Dr. Smith testified that he evaluated Hall, examined Hall's records and conferred with Ms. Wolkhaner and Dr. Auble concerning Hall. He testified that Hall began using drugs at an early age, around nine or ten. By the time Hall was twelve or thirteen, he was using alcohol and Valium in large amounts. This drug use adversely affected Hall's mental development. Hall's emotional maturation was arrested so that he became a "perpetual adolescent." Dr. Smith testified that persons in Hall's situation tend to be impulsive and tend not to consider the consequences of their behavior.

Hall ceased using drugs upon his incarceration and his mental and emotional maturation process recommenced while he was incarcerated. His only role models were other inmates. Dr. Smith testified it is important to explain to a jury about the process of addiction because the general public does not understand addiction and believes that drug use in this situation is a voluntary choice.

On cross-examination by Quintero, Dr. Smith testified that NyQuil is 60 to 70 percent alcohol and Benadryl is an antihistamine. The products will impair judgment and make a person drowsy. On cross-examination by the State, Dr. Smith testified that it was his understanding that Hall had been "clean" for about five years prior to the murders in this case. He testified that Hall's model of what people did in his environment was to control things by violence. He stated that under stress, people tend to go back to their basic survival strategies.

Dr. Pamela Auble, an expert in neuropsychology, testified on Hall's behalf. Dr. Auble administered Hall a number of psychological tests and evaluated the results thereof. None of the results indicated that Hall was malingering or exaggerating his problems. Hall, she testified, was operating in the average range of intelligence.

Dr. Auble testified that she was familiar with Dr. Kenneth Anchor, the psychologist who testified as Hall's mitigation witness at trial. She reviewed Dr. Anchor's report and trial testimony.

She also reviewed the testimony of the State's expert, Dr. Samuel Craddock. Dr. Auble's findings were consistent with early abuse of drugs. She found Hall to be impulsive. Dr. Auble opined that Hall wanted to get along with people but had trouble trusting them. Dr. Auble found no indication of brain damage or organic brain problems.

Dr. Auble disagreed with Dr. Anchor's evaluation that Hall suffered from Organic Personality Syndrome. Dr. Auble testified that her testing and evaluation of Hall was more extensive than that of Dr. Anchor. Dr. Auble testified that, in her opinion as a neuropsychologist, Dr. Craddock's diagnosis of Hall was more accurate than that of Dr. Anchor. She testified that Dr. Craddock had access to more information about Hall than did Dr. Anchor and that it was the responsibility of counsel to ensure that the expert is furnished with the appropriate materials and records. Dr. Auble testified that Dr. Anchor was suspended from practice roughly a year after the trial in this case. Dr. Auble thought she was contacted by Quintero's trial counsel but she did not remember the specifics, including whether the contact was before or after the trial.

Pat McNeill, Hall's half sister, is seventeen years older than Hall and did not live in the home with her mother and family when Hall was born. McNeill testified that the family lived in extreme poverty. They had no running water and no inside restrooms. Hall's father, McNeill's stepfather, worked on a boat and was frequently away from home. Hall and his mother had a close relationship. She described Hall as "mamma's baby," and explained that he did not wander far from his mother. Hall's parents were divorced when Hall was approximately three years old, but his father moved in with a lady down the street. McNeill testified that when the kids attempted to visit their father, he would chase them away. Their mother developed throat cancer and passed away. According to McNeill, their mother did not want to tell the children about her cancer right away. After their mother died, the children when to live with their father.

On cross-examination by the State, McNeill explained that very few people had running water at the time, though some had cisterns. The family did have electricity and used outhouses. She was asked about her stepfather, Gene Hall, but did not know if he was dead or alive.

Barbara Newton, Hall's sister, lived in the same house much of Hall's life. Newton explained that everything was fine at home until their mother died, at which time everything "went down hill." Newton admitted that she was recovering from alcoholism and drug addiction. Her stepmother was an addict and often provided drugs for the children. Hall also became addicted to drugs. She knew nothing of Hall's prison escape and the murders in this case until co-workers mentioned something about it. However, she did not know about the trial and indicated no one contacted her about testifying. On cross-examination, Newton stated that her brother, Robert Hall, knew her telephone number.

Barbara Cook, the daughter of Barbara Newton and niece of Hall, testified that Hall lived with them for a while when she was younger. Cook described Hall as more of a brother than an uncle, and indicated he protected her from everything. Cook testified that she had no knowledge of

Hall's trial but indicated she would have cooperated had she been contacted. She did acknowledge that she read about the escape in the newspaper, but made no attempt to contact Hall.

John Oliva, an attorney practicing law in Nashville, Tennessee, testified on Hall's behalf. After stating his credentials, Mr. Oliva described his trial experience, including his work on capital cases. Hall offered Mr. Oliva as an "expert attorney" for the purpose of establishing the standard for attorneys practicing criminal law in Tennessee. In preparation for his testimony, Oliva reviewed much of the trial record. Oliva explained that upon reviewing the records and having heard the testimony of trial counsel for Hall, he concluded that the work performed by trial counsel fell below the established standard. When asked about the basis of the standard, Oliva cited the standards promulgated by the American Bar Association. Giving specific references to various guidelines, Oliva opined that under each guideline, trial counsel failed to meet their duty. He also opined that counsel fell below the standard established by the United States and Tennessee Supreme Courts.

Dr. Patty Van Eys, a clinical psychologist who specializes in the area of child maltreatment and child psychopathology, also testified on Hall's behalf. Dr. Van Eys stated there are stages of health development in childhood. In Hall's early years, she noted several disruptions of attachment, including divorce and his mother's death. She specifically referenced a letter from Hall's mother indicating that Hall was pulled from her arms when he learned about her cancer. She further referred to records that Hall was malnourished as a child. Dr. Van Eys stated that following the loss of his mother, Hall was forced into the home of his father and step mother. His father was noticeably absent from the home and his stepmother was addicted to several substances. On cross-examination, Dr. Van Eys admitted that she had not spoken with Hall. Instead, she based her evaluation on communications with Dr. Auble and Ms. Wolkhaner.

Thomas Watson, an attorney licensed to practice law in Tennessee, testified as an expert witness on Bagwell's performance. In reviewing Bagwell's invoice for services in Hall's case, Watson testified that he did not meet with Bagwell on the three occasions listed on Bagwell's invoice. In fact, Watson testified that he never met with Bagwell and never discussed the case with him. Paul Morrow, also an attorney licensed to practice law in Tennessee, testified that he was a member of the Capital Case Resource Center during the late 1980's and early 1990's. Morrow testified that he did not confer with Bagwell about Hall's case on the three occasions listed on Bagwell's invoice. Morrow kept his files from the Capital Case Resource Center and there was no indication from his files or his memory that he had ever discussed Hall's case with Bagwell. Morrow testified that if Bagwell had called him, he would have referred him to other attorneys in the Center because Morrow's speciality was post-conviction proceedings.

Writ of Error Coram Nobis

As noted above, the appellants filed a joint petition for a writ of error coram nobis on the day that the post-conviction hearing commenced. The appellants alleged the existence of newly discovered evidence in the form of testimony from two fellow death row inmates, Ronnie Cauthern and Terry Lynn King, stating that Blanton confessed that the appellants were not present at the scene

when he killed the victims in this case. The appellants argued that this evidence may have resulted in a different verdict had it been presented at trial. Though the appellants missed the one year filing deadline, the trial court concluded that due process required consideration of the merits of the petition.

The concept of a petition for a writ of error coram nobis, which was developed in the common law, is now codified in Tennessee by statute. See Tenn. Code Ann. § 40-26-105. Relief may be granted under the statute "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." § 40-26-105(b). However, as our supreme court observed, "[t]he writ of error coram nobis is an extraordinary remedy known more for its denial than its approval." State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). According to the mandate of the statute, "relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated [earlier]." § 40-26-105(b). Moreover, the appellant must show that he or she "was without fault in failing to present certain evidence at the proper time." Id. Reaffirming its holding in Mixon, the supreme court recently stated the following regarding the standard to be applied when a trial court reviews a petition for a writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007) (emphasis in original). The decision whether to grant or deny relief rests within the sound discretion of the trial court. State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

A petition for a writ of error coram nobis must be filed within one year of the date the judgment becomes final in the trial court. Mixon, 983 S.W.2d at 671. However, our supreme court recognized that due process considerations may require tolling of this limitation period. See Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). In Workman, the court weighed the government's interest in preventing stale and groundless claims against the appellant's interest in having a hearing on the alleged grounds of newly discovered evidence that may establish actual innocence of a capital offense. Id. at 103. Noting the delay in obtaining the evidence was not attributable to the appellant, the court reasoned that due process afforded the appellant a "reasonable opportunity after the expiration of the limitations period to present his claim in a meaningful time and manner." Id. (internal quotations omitted).

In the instant case, the trial court stated that "the proffered evidence, if believed, would establish the actual innocence of" the appellants. Although the trial court concluded that the statute

of limitations should not bar consideration of the petition, the court did not comment on the obvious delay in presenting the evidence. According to the written petition, the appellants did not become aware of the evidence until the "summer of 2002." As noted above, the error coram nobis petition was filed on March 31, 2003. We do not find this to be such an inordinate delay as to have precluded the trial court from considering the petition. See Workman, 41 S.W.3d at 103 (thirteen month delay in filing petition after discovery of evidence did not exceed the reasonable opportunity afforded by due process). Nor do we find that the statute of limitations prevented the trial court from considering the merits of the petition. Id. ("Weighing these competing interests in the context of this case, we have no hesitation in concluding that due process precludes application of the statute of limitations to bar consideration of the writ of error coram nobis in this case."). The State did not object to the trial court's consideration of the petition, thus any objection raised on appeal regarding the statute of limitation is deemed waived. See Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003); Calvin O. Tankesly v. State, No. M2004-01440-CCA-R3-CO, 2005 WL 2008203 at *6 (Tenn. Crim. App., Aug. 19, 2005). We now review the trial court's denial of error coram nobis relief under an abuse of discretion standard. Hart, 911 S.W.2d at 375.

The proof in support of the error coram nobis petition in this case was presented simultaneously with the post-conviction proof, and the trial court ruled upon both petitions in consolidated orders for each appellant. However, the nature of the separate petitions and the burden of proof required for the requested relief are different. Because a writ of error coram nobis is an "*extraordinary* procedural remedy," Mixon, 983 S.W.2d at 672, the relief obtainable is confined to errors outside the record and to matters which were not or could not have been litigated during the trial or post-conviction proceedings. § 40-26-105(b); Arthur L. Armstrong v. State, No. M2005-01325-CCA-R3-CD, 2006 WL 1626726 at *5 (Tenn. Crim. App., Jun. 8, 2006). While the facts are necessarily intertwined, as both petitions relate to the same trial proceeding, and the requested relief is similar, the courts must review each petition independently under the applicable law governing the statutory remedies. We discuss later in the opinion the issues presented in the post-conviction petition.

The trial court ruled on the error coram nobis petition before considering the grounds for relief presented in the post-conviction petition. The testimony of Terry Lynn King and Ronnie Cauthern is summarized above. The trial court examined this evidence in light of the proof presented at trial. However, the court correctly did not reference any of the proof presented in support of the post-conviction petition. In reviewing the merits of the error coram petition, the courts are bound to look only at the evidence presented at trial and that offered in support of the coram nobis petition to determine whether the new evidence may have led to a different result. Vasques, 221 S.W.3d at 527.

The trial court made the following ruling on the petition:

[Appellants] would have the Court believe the testimony of inmates Cauthern and King that Blanton, before he died, stated to them that Blanton would testify to exonerate [the appellants]. They testified that Blanton would not so testify during his

-35-

life because it would damage his own appeal. It may be safely assumed that Blanton's case would be on a similar time line as that of [the appellants]. Had Blanton been alive and testified to exonerate [the appellants], it still would have damaged his own post-conviction case. In short, the motive for Blanton to remain silent would still exist if Blanton were alive. [The appellants] would have the Court believe that Blanton, a twice-convicted murderer, would have sacrificed his own case (and possibly his life) to aid [the appellants] and to insure that justice was served.

Also, Blanton's supposed statement to inmate King was to the effect that Blanton alone killed Mr. Vester from inside the house when Mr. Vester resisted Blanton's efforts to steal the Vester's car. Neither inmate indicated that "Zack" assisted in committing the murders, only that he was present. These inmates' recitation of Blanton's supposed statement do not conform to the evidence of the Vesters' murders. To believe this statement, this Court would have to accept the fact that Blanton killed the Vesters using two different firearms and a knife. One inmate testified that Blanton mentioned an "old man" while the other testified that "they" resisted and he had to kill "them." King testified that Blanton killed the "old man" in order to steal his truck when in fact it was a car that was stolen. The supposed statement of Blanton simply does not square with the known facts.

Even assuming by some miracle that Blanton had testified at [the appellants'] hearing as the inmate witnesses related his statements to them, Blanton would have been devastated on cross-examination using the known facts of the murders to such an extent that his entire testimony would have been unbelievable.

The Court finds that the proffered testimony would not have altered the result of [the appellants'] trial. There is no "reasonable probability" that the result of the proceeding would have been different.

The trial court clearly was not "reasonable well satisfied" with the veracity of King's and Cauthern's testimony. Under the governing standard, the court could have ended its inquiry after reaching that conclusion. Nothing in the record suggests that the trial court abused its discretion in this respect. The error coram nobis petition states that, "[i]n the summer of 2002, post-conviction counsel for William Hall was informed that post-conviction counsel for Derrick Quintero had obtained statements from inmates that exonerated their clients." Blanton's statements to Cauthern and Hall were necessarily made prior to his death in 1999. While considering the truthfulness of this alleged newly discovered evidence, this Court cannot ignore the fact that well over two years passed before either Cauthern or King revealed the information to the appellants or their counsel. Though Cauthern testified that Blanton was hesitant to jeopardize his own case by confessing, this concern was obviated by Blanton's death. The timing of the discovery of this proffered evidence is suspicious. Although this does not affect the timeliness of the petition itself, it does bear upon the Court's consideration of the veracity of the testimony.

Assuming the trial court was "reasonably well satisfied" that the newly discovered evidence was truthful, its conclusion that the evidence would not have altered the verdict is otherwise reasonable. As recounted above, the trial court discussed the variances between the details of Blanton's statements to King and Cauthern and the evidence introduced at trial: Blanton apparently stated he alone killed both victims even though the evidence demonstrated that three different weapons were used; Blanton apparently told King he killed an "old man" while he told Cauthern he killed "them"; and Blanton mentioned that he killed Mr. Vester during a struggle when evidence at trial showed he was shot from outside the home. Although the appellants argue that the variances can be explained, we agree with the trial court's finding that the testimony of Cauthern and King would not have resulted in a different verdict. Moreover, Blanton supposedly informed King that Zach Pallay accompanied him to the Vester residence. However, Pallay testified at trial that he had no involvement in the crimes committed against the Vesters. Pallay's testimony would have directly contradicted that of King and Cauthern, who would have been subject to cross-examination on the matter.

We conclude that the trial court did not abuse its discretion in denying relief on the error coram nobis petition. The appellants, therefore, are entitled to no relief on this issue.

<u>Post-Conviction Burden of Proof and Standard of Review</u>

The appellants' post-conviction petitions are governed by Tennessee's Post-Conviction Procedure Act. <u>See</u> Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, an appellant must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. <u>See</u> Tenn. Code Ann. § 40-30-103. The appellant must establish the factual allegations contained in his petition by clear and convincing evidence. <u>See</u> Tenn. Code Ann. § 40-30-110(2)(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. <u>Hicks v. State</u>, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the trial court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. <u>State v. Nichols</u>, 90 S.W.3d 576, 586 (Tenn. 2002) (citing <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn.1999)); <u>Cooper v. State</u>, 849 S.W.2d 744, 746 (Tenn. 1993). An appellant has the burden of establishing that the evidence preponderates against the trial court's findings. <u>Henley v. State</u>, 960 S.W.2d 572, 579 (Tenn. 1997). This Court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. <u>Nichols</u>, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. <u>Bates v. State</u>, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

However, claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. <u>State v. Honeycutt</u>, 54 S.W.3d 762, 766-67 (Tenn. 2001); <u>Burns</u>, 6 S.W.3d at 461. As such, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct

unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). A trial court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are reviewed under a de novo standard, with *no* presumption of correctness. Id.

### Claims of Ineffective Assistance of Counsel

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984); see Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000).

The Supreme Court has adopted a two-prong test to evaluate a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278 (quoting Strickland, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). Finally, we note that criminal defendants are not entitled to

perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n. 38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case ." Id. at 785.

If the appellant shows that counsel's representation fell below a reasonable standard, then he or she must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether an appellant satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, an appellant must establish that the deficiency of counsel was of such a degree that it deprived the appellant of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Moreover, when challenging a death sentence, an appellant must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695). If either element of the claim has not been established, the reviewing court need not address the other element. Strickland, 466 U.S. at 697.

Appellant Quintero's Issues

I. Claims Regarding Counsel's Representation<br>A. Pretrial Assistance

Quintero initially contends that his attorneys failed "to maintain a workload level which would accommodate the preparation needs for a trial on a capital offense." He argues that the caseload demands and budgetary restraints of the Public Defender's Office at that time effectively prevented his attorneys from providing effective assistance. Attorney Weems candidly testified during the hearing that his office was overworked and underbudgeted. However, aside from general assertions that his attorneys were "merely warm bodies in the courtroom during trial," the alleged resulting prejudice from counsel's caseload at the time is intertwined with several other instances of ineffectiveness claimed by Quintero. Quintero has not demonstrated how counsel's workload, considered alone, prejudiced the outcome. Though Quintero takes exception to the State's comments that the length of the trial has a bearing upon the issue, this Court concludes that trial counsel did

more than merely "shoot from the hip," as stated in Quintero's brief. A review of the extensive record reveals that counsel was intimately involved, both before and during, this six week trial.

Similarly, Quintero asserts that his attorneys did not adequately communicate with him before trial, thereby preventing him from participating in his defense. Testimony from the post-conviction hearing revealed that counsel met in person with Quintero at least two times prior to trial and talked to him on the telephone numerous times despite the office policy against accepting collect calls due to budget concerns. Quintero contends that this limited pretrial communication does not require a showing of prejudice. This Court disagrees. Quintero has failed to show how the nature and extent of the pretrial communication, standing alone, had any bearing on the outcome of the trial. However, similar to his claim regarding counsel's workload, Quintero offers specific instances of ineffective assistance in support thereof. The Court will now address the specific instances of ineffective pretrial assistance alleged by Quintero.

### 1. Kathleen Bernhardt and Celerino Quintero

Quintero claims counsel's inadequate investigation failed to produce two key defense witnesses: Kathleen Bernhardt and Celerino Quintero. According to Quintero, Bernhardt's testimony could have supported mitigation during sentencing "as it demonstrated that under similar circumstances, Quintero specifically chose to leave a victim tied up and unharmed rather than killing her." However, her testimony would not have been beneficial at the guilt phase, even had counsel known about her, because the defense theory was that the state could not prove Quintero's involvement in the murders solely on circumstantial evidence. The similarities between the two criminal episodes would have been more detrimental than helpful to Quintero's defense. Similarly, highlighting Quintero's prior convictions at trial would have been a dubious decision. Furthermore, trial counsel acknowledged that the state could simply have argued during sentencing that because Quintero was apprehended after his encounter with Bernhardt, he decided not to make the same mistake again. Although the trial court concluded that Bernhardt's testimony would only have been slightly beneficial to Quintero, it otherwise concluded there was no resulting prejudice due to counsel's failure to call her as a witness. Likewise, we find no resulting prejudice in failing to call Bernhardt as a witness during either phase of the trial.

The deposition of Quintero's father is summarized earlier in this opinion. Quintero contends his attorneys should have interviewed his father prior to trial and ultimately called him to testify as an alibi witness. However, Mr. Quintero testified that his son was adamant about him not getting involved in the trial, and he stated that he "more likely than not" would not have talked to any lawyers about his alleged involvement in the escape. Similarly, Mr. Quintero admitted that he was distrustful of lawyers and the legal system because of his previous experiences.

Mr. Quintero communicated with his son while the appellant was in custody pending trial, however, he stated he did not know the actual trial date until after the trial concluded. He testified that he did not tell any member of his family about his alleged involvement until years later, despite the fact that other members of the family testified at trial on Quintero's behalf. And although Mr.

-40-

Quintero commented on the closeness of his family, he did not have any explanation why some of his family, who attended the trial, did not inform him of the trial date. This Court, as did the trial court, finds Mr. Quintero's "deposition lacks the ring of truth with regard to the fact that he did not know when [his son's] trial was held." Especially since Quintero cooperated with the mitigation specialist who interviewed members of his family who actually attended the trial.

Quintero's complaint about his attorneys investigation in this respect is intertwined with his alleged alibi. However, Quintero did not come forward with information about his alleged alibi until the filing of the instant post-conviction petition. During the post-conviction hearing, Quintero testified that he did not inform his trial counsel about his version of the facts because he "wanted to hear what they had to say." He also testified that he did not speak of his father as an alleged alibi witness because "they got me to a point I just didn't trust them anymore. I didn't have no faith in them, the system." When he was questioned during the hearing whether he made a conscious decision not to discuss his alleged alibi, Quintero responded, "well, I guess - I guess it boils down to that, yeah. A stupid decision, I guess, but it was - it was conscious, I guess." Mr. Quintero referred to this same distrust of "the system" and suggested that he would not have cooperated even had he been approached by the defense team.

We cannot conclude, based upon a comprehensive reading of the testimony of Quintero and his father in light of the entire record, that counsel rendered ineffective assistance in failing to call Mr. Quintero as a defense witness. Quintero cooperated with the defense team in providing information about his background. It is evident from the record that Quintero did not want his father to worry about his trial, presumably because of his father's health condition at the time. However, as the trial court commented, "in view of the fact that his father was the main alibi witness, it strains credulity to believe that this alibi was not mentioned." Quintero's claim of an alibi is intertwined throughout his issues, and this Court will further discuss the matter later in the opinion. In respect to the identification of defense witnesses, though, the Court does not conclude that counsel was ineffective.

### 2. Ben Spencer

Next, Quintero contends trial counsel was ineffective for failing to investigate and discover the name change of the prison barber. Trial counsel remembered hearing laughter after Ben Spencer testified about his name change. Further, one of the jurors who testified at the hearing stated he did not give Spencer's testimony much credibility because of his name change. We do not find that counsel's conduct was deficient in this respect. We agree with the State that counsel had no reason to check civil court records in another state for possible name changes of witnesses. Accordingly, counsel's performance in this respect did not fall below objective standard of reasonableness which is demanded of attorneys.

### 3. Zachary Pallay

During trial, Zachary Pallay testified about his criminal record, including his prior arrests. 976 S.W.2d at 148. After Pallay left the witness stand, defense counsel was informed that Pallay may not have been completely forthcoming about his previous arrests. However, the trial court did not allow counsel to introduce into evidence certified copies of three arrest warrants issued against Pallay. The appellants were given the opportunity to subpoena Pallay and cross-examine him about the three arrests, but they neglected to do so. On direct appeal, the appellants were deemed to have waived any error because they did not avail themselves of the available remedy under Tennessee Rule of Criminal Procedure 608(b). 976 S.W.2d at 149.

Quintero now argues that trial counsel was ineffective for failing to properly investigate Pallay's criminal history for impeachment purposes. The State contends Quintero did not carry his burden of proof on this ground because he failed to introduce copies of the arrest warrants at issue. Quintero, however, counters that the trial transcript demonstrates, by clear and convincing evidence, that trial counsel failed to thoroughly investigate Pallay's arrest history. As noted above, the trial court did not allow trial counsel to introduce extrinsic evidence of the arrests. The record, therefore, does not contain copies of the actual warrants. The trial attorneys apparently had copies of the warrants in their possession. However, copies of these warrants were not introduced into evidence at the post-conviction proceeding. Quintero had ample opportunity to introduce the warrants. Moreover, Pallay testified at the hearing but Quintero apparently chose not to question him about the truthfulness of his trial testimony. Hall did question Pallay about his previous felony *convictions* and Pallay reaffirmed his trial testimony that prior to 1988 he had only been convicted of one felony, armed robbery.

We agree with the State that Quintero has failed to carry his burden of proof on this issue. When questioned at trial if he had any other arrests since he was released from prison on his robbery conviction, Pallay testified that he could not recall at that time whether or not he had been arrested. Although Quintero asserts that Pallay lied during his testimony at trial, Quintero did not attempt to elicit at the hearing below any explanation from Pallay about his trial testimony in this respect. Notwithstanding, the Court finds that the result of the proceeding would not have been different had Pallay testified in front of the jury about his other alleged arrests. The jury already knew Pallay was a convicted felon and there is no suggestion that Pallay was ever convicted of criminal activity based upon the three arrest warrants. This alleged ground of ineffective assistance of counsel is, therefore, without merit.

### 4. Defense Theory

Quintero argues that trial counsel failed to formulate a comprehensive defense theory. Trial counsel testified that their trial strategy was to highlight the State's inability to prove beyond a reasonable doubt, based upon purely circumstantial evidence, that Quintero was involved in the commission of the murders. We are reminded that "[j]udicial scrutiny of [counsel's] performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs,

-42-

205 F.3d at 278 (quoting Strickland, 466 U.S. at 689). Moreover, we must defer to counsel's trial strategy and tactical choices if they are informed ones based upon adequate preparation. Hellard, 629 S.W.2d at 9. The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad, 938 S.W.2d at 369. Quintero's claim regarding a comprehensive defense centers on counsel's failure to discover the alleged alibi. We have already concluded that trial counsel was not ineffective in failing to call Ms. Bernhardt or Quintero's father as witnesses. And as discussed below, trial counsel did not render ineffective assistance with regard to Quintero's right to testify. Counsel acknowledged they had open access to all of the State's files. Based upon our complete review of the record, and in light of the State's reliance upon circumstantial evidence in its case in chief, counsel's defense theory was reasonable.

5. Right to Testify and Alibi

Quintero claims his attorneys failed to inform him of his right to testify. As noted above, Quintero testified at the post-conviction hearing that he was surprised when his attorneys rested their case without calling him to the stand. He stated he wanted to testify at trial, but according to Quintero his attorneys made a unilateral decision to do otherwise. Though counsel was not specifically questioned during the hearing whether they discussed with Quintero his right to testify, the evidence clearly demonstrates that Quintero was advised against testifying at co-defendant Blanton's trial. Moreover, having previously been involved in several other criminal trials, Quintero was no stranger to the criminal justice system. In fact, Quintero admitted that he testified on his own behalf in his previous cases.

Quintero contends that his testimony at trial would have supported his alibi defense, and he offered his version of the facts and circumstances surrounding his escape from prison in Kentucky. As such, he argues that, but for counsel's deficiency in this respect, the result of his trial would have been different. Although the post-conviction court found Quintero's testimony regarding his right to testify incredible, it nonetheless conducted a harmless error analysis on the issue after concluding that the record did not affirmatively demonstrate Quintero waived his right to testify. See Momon v. State, 18 S.W.3d 152 (Tenn. 1999).

As the post-conviction court correctly recognized, a criminal defendant has a fundamental right to testify at his own trial. See, Momon, 18 S.W.3d at 157. This right may only be waived personally by the defendant. Id. at 161. However, a waiver of this right will not be presumed from a silent record. Id. at 162. To ensure that a record of the trial proceedings affirmatively demonstrates a defendant personally waived his fundamental right, our supreme court in Momon established procedures which should be followed in future cases. Id. However, the court specifically stated that the procedures adopted did not amount to a new constitutional rule of law requiring retroactive application. Id. at 163.

Nevertheless, if a defendant can prove in the post-conviction context that trial counsel denied him his right to testify, there is constitutional error. Thus, the ultimate question for us remains whether counsel was ineffective in failing to advise Quintero of his right to testify. See Mario

Deangalo Thomas v. State, No. W2004-01704-CCA-R3-PC, 2005 WL 1669898 at *3-4 (Tenn. Crim. App., July 18, 2005), perm. to app. denied, (Tenn. Dec. 5, 2005); Maria Maclin v. State, No. W2003-02667-CCA-R3-PC, 2004 WL 2715342 at *10 (Tenn. Crim. App., Nov. 24, 2004), perm. to app. denied, (Tenn., May 23, 2005) ("prior to the supreme court's holding in Momon, an appellant's claim that his counsel prevented him from testifying in his own behalf was treated like any other ground asserted for a claim of ineffective assistance of counsel").

Prior to conducting a harmless error analysis, the trial court made the following statements regarding Quintero's claim:

> Due to an absence of proof from the State, this Court is left with only the testimony of Appellant, which this Court does not find to be credible. He testified that he had been a defendant in at least three prior criminal trials and, in those cases and this one, none of his counsel ever advised him that he had the right to testify. In his Kentucky cases, Appellant stated that his trial counsel simply told him to take the witness stand without advance notice [or] preparation. It simply defies credibility that this happened on all three occasions. Perhaps once, but certainly not all three times. In his Tennessee trial, Appellant would have this Court believe that his trial counsel rested his case and that Appellant was not aware of it. Even someone who has never been in a courtroom knows what "The Defense Rests" means. Appellant would have this Court further believe that he was in a stupor induced by cold medication and did not realize what was going on. This, in spite of the fact that both defendants had to be cautioned more than once during the trial for excessive talking. Evidence was introduced at the Post-Conviction hearing that Appellant and his trial counsel discussed Appellant's right not to testify during the separate trial of Blanton. Obviously, the right NOT to testify is distinct from the right TO testify but we do know that the subject was discussed. The opinion of the Court of Criminal Appeals in the Blanton case supports that Appellant elected not to testify. State v. James Blanton, No. 01C01-9307-CC-00218, 1996 WL 219609 (Tenn. Crim. App., Apr. 30, 1996). Given this information, it is simply not believable that the subject of Appellant testifying was never discussed. This Court does not find Appellant's testimony in this regard to be credible.

Given our review of the issue, we conclude that Quintero has not met his burden of proof by clear and convincing evidence. Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks, 983 S.W.2d at 245. Quintero claims his trial attorneys never informed him of his right to testify. However, Quintero was familiar with trial proceedings in criminal cases. Indeed, as he testified, he "had pretty good experience - or a lot of experience - in court in the criminal process." Furthermore, Quintero testified in at least three previous trials, and he made the decision not to testify at Blanton's trial. The post-conviction court found Quintero's testimony on this issue to be incredible. We agree.

Quintero suggests that his testimony would have supported his contention that he was not in the area on the date of the murders. Again, the court below found it hard to believe Quintero would have waited until he filed the instant petition to reveal his version of the facts. We agree. During the post-conviction hearing, Quintero testified he made a "conscious decision" not to inform trial counsel about his alibi. He stated that he did not tell his verison of the facts to his attorneys because he "wanted to hear what they had to say." In considering whether he has met his burden by clear and convincing evidence such that there is no serious or substantial doubt about the accuracy of the conclusions drawn therefrom, we must look at the entire picture.

Quintero's claim that counsel did not inform him of the right to testify necessarily stems from his desire now at this stage of the proceeding to assert his version of the events surrounding the crimes in this case. The trial court repeatedly emphasized its belief that Quintero manufactured his story after the fact. Quintero acknowledged that he read the transcript of the trial, and he had the benefit of reading the summary of the evidence by this Court and the supreme court prior to filing his petition. The inference drawn from the combination of Quintero's experience in criminal trials and his own statement that he made a conscious decision not to tell his trial attorneys about the alleged alibi leaves this Court with a serious and substantial doubt about the accuracy of the Quintero's post-conviction testimony.

Quintero retains the burden of showing prejudice. However, because trial counsel was not specifically questioned about any discussions they had with Quintero concerning his decision, the record otherwise remains silent on the matter. The trial court thus conducted a harmless analysis, and we have also decided to engage in one. See Mario Deangalo Thomas, 2005 WL 1669898 at *4. See Terrance B. Smith v. State, No. W2004-2366-CCA-R3-PC, 2005 WL 2493475 at *7-9 (Tenn. Crim. App., Oct. 7, 2005), perm. to app. denied, (Tenn., Mar. 27, 2006). Though not exclusive, the list of factors which have typically been considered by the courts in this type of analysis are: (1) the importance of the defendant's testimony; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case.

Presumably Quintero's testimony would have been important to his defense. However, his criminal record would have been introduced into evidence. Although the jury was already aware he escaped from prison, they would have learned that he also escaped from prison on a previous occasion. Moreover, Quintero's story would have been contradicted in an important respect by Pallay. Quintero testified that Pallay drove him and Hall to Nashville to meet his father. However, Pallay testified that he did not encounter Quintero during that period of time and that he had never seen Hall prior to the trial.

The post-conviction court noted that Quintero's testimony would further have been directly contradicted by other substantial evidence. During his proffer, Quintero testified he spent Saturday night, June 18, 1988, alone in the woods, and after he awoke he met up with Hall Sunday morning, June 19, 1988. He testified the two of them stayed hidden in the woods all day Sunday until that evening when they supposedly met with Pallay. However, telephone calls were placed from the

-45-

Harris home to the home of Quintero's relatives in Texas that Sunday morning. Moreover, Hall's fingerprints were found at the Crawford residence, which was not burglarized until after 2:00 pm that Sunday. Hall testified at the post-conviction hearing that he did not run into Quintero until sometime around dark Sunday night. Quintero also he said he was wearing gloves on Sunday when he hid the .22 rifle he stole from the Foster home in a drainpipe near where he met Hall that morning. The only gloves reported missing were from the Crawford home. The glove found at the Vester's matched the one stolen from the Crawford home. Because we have already found that trial counsel was not ineffective in calling Mr. Quintero as a witness, Quintero's testimony would not have been corroborated by his father.

Although circumstantial, the evidence in this case has already been found to be sufficient. When considered in light of the entire record, any error regarding counsel's failure to advise Quintero of his right to testify is harmless. We cannot review the nature of Quintero's proffered trial testimony without taking into account his unreasonable explanation for not disclosing the information at an earlier date. Quintero testified he did not know the time of death, despite sitting through the entire six week trial and admitting that he listened to the testimony of the fisherman who heard gunshots the night of June 20, 1988, and knew the evidence showed that a newspaper dated June 20, 1988, was found inside the Vesters' home. Quintero was questioned on cross-examination during the hearing: "And that didn't strike you as, hey, wait a minute, I wasn't there?" He did not respond.

As our supreme court recognized in Momon,

[a] denial of the defendant's right to testify does not in all cases render a criminal trial fundamentally unfair or call into question the reliability of the trial as a vehicle for determining guilt or innocence. Such an error involves the exclusion of testimony which is evidence that can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."

18 S.W.3d at 166 (internal citations omitted). The Court stated that a harmless error analysis "strikes the appropriate balance between the judicial system's interest in obtaining reliable results and the system's competing interest in having litigation end at some point." Id. at 167. It emphasized that "the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." Id. at 168. The Court concludes that Quintero did not carry his burden of proof on this claim. We otherwise conclude that any error in this respect was harmless beyond a reasonable doubt. As we commented above, we have a serious and substantial doubt about the veracity of Quintero's post-conviction testimony. Likewise, given the existence of the other contradictory evidence, Quintero's manufactured alibi would have been apparent to the jury. We do not believe the jury would have given much weight to Quintero's version of the facts. This claim is without merit.

6. Pretrial Motions

-46-

Next, Quintero complains about counsel's failure to file necessary pretrial motions. Specifically, he argues counsel was ineffective for failing to file a motion for a bill of particulars regarding the time of death, a motion for funds for an investigator, and a motion for funds for an expert in fingerprint analysis. Regarding the bill of particulars, Quintero asserts it was necessary for counsel to pinpoint the State's theory on time of death in order to present an alibi defense. It is clear from the evidence introduced at the hearing below that both appellants were provided an open-file policy by the prosecution. Moreover, Attorney Roberts testified that neither defense team was surprised at trial by the testimony of the fisherman who heard the gunshots the night of June 20, 1988. Although Quintero's trial counsel was not specifically questioned about their knowledge of the State's theory on time of death, the evidence otherwise demonstrates that counsel was aware of the fishermen's statements. As noted previously, Quintero admitted hearing this testimony during trial, yet he failed to alert counsel to any possible alibi. We find no deficiency on counsel's part regarding this issue.

Trial counsel testified that their office received funding for an investigator. However, because of their caseload at that time, the office budgeted the funding for an additional attorney instead of hiring an investigator. Counsel stated that his requests for funds to hire investigators in previous capital cases were denied. Regardless, Quintero has failed to demonstrate prejudice. Aside from the testimony of Quintero's father and Ms. Bernhardt, Quintero failed to present evidence of what an investigator would have discovered. Trial counsel's performance regarding Mr. Quintero and Ms. Bernhardt is discussed above. This Court concludes that Quintero has failed to carry his burden of proof on this claim. We also conclude that Quintero has failed to establish prejudice regarding the request for funding of a fingerprint expert. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so that the post-conviction court can properly evaluate the evidence or witness. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." Id. Quintero did not produce a fingerprint expert at the post-conviction hearing to call into doubt the testimony of the State's expert at trial.

Finally, Quintero contends trial counsel was ineffective by failing to file appropriate pretrial motions challenging the prosecutor's discretion in seeking the death penalty, limiting the State's proof at sentencing to specific aggravating circumstances, dismissing the felony murder aggravating circumstance, and challenging the constitutionality of the death penalty statute. However, Quintero has failed to demonstrate prejudice, as this Court and the supreme court addressed the substantive merit of these claims on appeal and found them to be without merit. See generally 976 S.W.2d 121.

B. Trial Assistance

Quintero alleges numerous instances during trial where counsel failed to voice necessary objections, failed to adequately cross-examine witnesses, failed to make proper argument, failed to present sufficient mitigation and failed to conduct an adequate voir dire. We are reminded that we

"must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Both the post-conviction court and the State on appeal correctly observe that counsel was not questioned about their conduct regarding the majority of the allegations, and further, that no evidence was otherwise introduced to support his burden of proof. Quintero is required to establish the factual allegations contained in his petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(2)(f). We will comment on each allegation in turn.

### 1. Witness Testimony and Introduction of Evidence

Quintero argues that trial counsel failed to object to testimony which identified his fingerprints on some of the weapons and ammunition recovered. Counsel was not questioned why he did not object to the testimony. Regardless, as we stated above, Quintero failed to introduce proof which would have called into doubt the trial testimony in this respect. Similarly, we find no error in counsel's failure to question the testimony that heat would have destroyed any fingerprints on the victims' car despite the existence of Blanton's prints on a beer can found inside the car in Memphis. Counsel was not questioned about his examination of this witness and we must, therefore, presume that his conduct was reasonable trial strategy.

Quintero contends that counsel did not adequately challenge the introduction of two guns taken from the Foster house based on a break in the chain of custody. However, as Quintero acknowledges in his brief, counsel did voice an objection regarding the chain of custody. The trial court overruled the objection. Again, counsel was not questioned about his decision to object during the hearing below. Nevertheless, counsel's conduct did not fall below that which is constitutionally mandated merely because the trial court overruled his objection. Quintero also contends counsel failed to object to hearsay evidence by Sheriff Hicks. As the post-conviction court observed, counsel voiced countless objections to testimony during the duration of this six-week trial. Notwithstanding the fact that counsel is not required to conduct a perfect trial, Quintero has failed to explain how the outcome of the trial would have been different had the trial court sustained any objections to the purported hearsay testimony.

According to Quintero, trial counsel should have voiced an objection to the allegation that the jailor illegally medicated Quintero with cold medications during trial. Although Quintero testified that he was given cold medicine at night which made him groggy during the day, neither of his attorneys were questioned about his appearance during trial. Indeed, the trial court commented that both defendants had to be cautioned more than once during trial for excessive talking. We find Quintero's claim farfetched that he did not know what was happening during his trial because he was taking cold medication. Although his argument is couched in terms of an ineffective assistance of counsel claim, Quintero has simply failed to meet his burden of proof by not ascertaining trial counsel's knowledge, or lack thereof, of the alleged illegal administration of medication.

Next, Quintero argues that counsel should have objected on relevancy grounds to the testimony of one of the guards at the Kentucky prison who was asked to describe Quintero's appearance within a two-week period of time prior to the date of Quintero's escape. However, we do not find counsel's conduct with regard to this witness deficient. As Quintero acknowledges in his brief, counsel was able to elicit on cross-examination that this witness did not know how Quintero looked the day he escaped. Quintero also argues counsel was ineffective in failing to request a mistrial due to the State's "persistent" leading during the direct examination of Pallay. The trial court sustained defense objections raised during the State's examination. Again, however, Quintero neglected to question counsel during the hearing below about their decision not to request a mistrial. In the absence of proof to the contrary, we presume counsel's decision was based upon sound trial strategy.

The post-conviction court concluded that Quintero cited no specific instances in support of his blanket claim that trial counsel failed to adequately cross-examine witnesses. On appeal, he contends that counsel failed to request Jencks material before engaging in the cross-examination of Pallay. According to his argument, that failure affected counsel's ability to effectively question Pallay about his inconsistent statements. As we noted in our earlier discussion about this witness, Pallay testified at the post-conviction hearing, yet Quintero apparently chose not to question him about the truthfulness of his trial testimony. We conclude, therefore, that Quintero has failed to satisfy his burden of proof on this ground.

## 2. Closing Arguments

Quintero contends trial counsel failed to voice necessary objections during the State's closing argument and, further, failed to request a mistrial based upon the overall improper content therein. Again, Quintero failed to question counsel about their actions during argument. Trial counsel successfully objected at various times during the State's argument. Furthermore, Quintero raised on direct appeal an issue about the State's argument. This Court held: "Having reviewed the entire record, we find that any improper comments during closing arguments by the prosecution were either harmless error or cured by the trial court's curative instructions to the jury." 976 S.W.2d at 157. The Court further concluded: "[C]onsidering the nature of the case, the prosecution's minimal comments during closing arguments were not reversible error. The trial court sustained the objections and gave curative instructions. It is presumed that the jury followed these instructions and disregarded the prosecution's improper argument." Id. The challenge to the State's closing argument has previously been determined. Tenn. Code Ann. § 40-30-106(h). Nevertheless, the record reflects that trial counsel made appropriate objections during closing argument, and we conclude that counsel did not render ineffective assistance by failing to move for a mistrial.

Next, Quintero contends that counsel did not give an appropriate closing argument based upon their theory of defense. On appeal, he offers an alternative argument. However, the fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad, 938 S.W.2d at 369. Quintero neglected to question counsel about their strategy during closing at the end of the guilt phase. Nevertheless, we do not find that counsel's performance

-49-

was deficient. Similarly, Quintero claims counsel was ineffective in not presenting a closing argument at the conclusion of the penalty phase. Counsel testified he chose not to argue so that the State would be prevented from referring to Quintero during their argument, and also because he felt their mitigation witnesses spoke for themselves. Quintero, however, did not question counsel about this decision. Again, we may not second-guess trial strategy. The post-conviction court concluded that counsel's decision was a tactical decision made to prevent the State from making a strong rebuttal argument. The record supports this conclusion.

### 3. Severance

During trial, Pallay's prior statement was read to the jury in order to impeach his previous trial testimony. Pallay's statement referenced his past association with Quintero, and part of that statement included a comment that Pallay was "not taking up for no killer." Counsel objected to the introduction of the statement and moved for a mistrial. The trial court denied both. On direct appeal, Quintero raised as an issue that the reading of Pallay's unsworn statement violated his right to confront the witness. 976 S.W.2d at 149-50. This Court held that, although the introduction of the statement was permissible, the trial court erred in failing to redact the portion wherein Pallay stated, "I'm not taking up for no killer." Id. at 151. However, the Court concluded that the error was harmless beyond a reasonable doubt. Id. Pallay had already testified at trial that he knew Quintero and that Quintero would probably pass through the Leatherwood community during his escape. Given this Court's review of the underlying complaint on direct appeal, we now conclude that the result of the proceeding would not have been different had counsel challenged in the motion for new trial the trial court's refusal to sever the cases.

### 4. Jury Selection

Finally, Quintero challenges counsel's conduct during jury selection. The only inquiry Quintero made of counsel about voir dire during the post-conviction hearing related to counsel's decision regarding the wife of the former sheriff. He does not challenge counsel's decision regarding that particular juror. Quintero contends, however, that counsel should have objected to the exclusion of certain other prospective jurors based upon their views on capital punishment. This issue was raised by Quintero on direct appeal and was addressed on the merits by this Court. 976 S.W.2d at 141-42. Accordingly, this argument has previously been determined. Tenn. Code Ann. § 40-30-106(h).

### C. Appellate Assistance

Quintero argues he is entitled to another appeal of his convictions and sentence due to the ineffective assistance of counsel on appeal. The same principles apply in determining the effectiveness of both trial and appellate counsel. See Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). An appellant alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the appellant's

appeal would have been successful before the state's highest court. See Smith v. Robbins, 528 U.S. 259, 285 (2000).

The following are the specific instances of misconduct he alleges: counsel did not sufficiently argue the confrontation clause issue regarding Pallay's prior statement; counsel did not sufficiently argue the issue of prosecutorial misconduct during closing argument; counsel did not adequately argue against the sufficiency of the evidence; and counsel did not properly argue against the exclusion of those jurors opposed to the death penalty. Although counsel presented these issues in their appellate brief on direct appeal, Quintero contends their arguments in support thereof should have been different. As we have already stated, the fact that a particular argument failed does not by itself establish ineffective assistance of counsel. Goad, 938 S.W.2d at 369. All of these issues were found to be without merit on appeal.

However, counsel's failure to obtain relief on behalf of their client does not equate to ineffective assistance of counsel. Certainly counsel may have included the alternative arguments now presented by Quintero in post-conviction. However, counsel sufficiently raised the issues for review by this Court on direct appeal. Quintero is not entitled to perfect representation. Denton, 945 S.W.2d at 796. Indeed, there is no requirement that counsel challenge on appeal every aspect of the trial proceedings. "[T]he determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). After review, we conclude that counsel's arguments on appeal were competent, and thus did not fall below an objective standard of reasonableness.

Quintero also asserts that counsel did not sufficiently challenge the jury instructions regarding the elements of the charged offenses and the lesser included offenses of felony murder. Specifically, Quintero argues the trial court improperly instructed the jury it did not need to find malice to convict the defendants of felony murder. Quintero is unable to establish prejudice in this instance because, as the State notes, this Court has previously ruled adversely on this particular argument. See State v. Norris, 684 S.W.2d 650, 652 (Tenn. Crim. App. 1984). He is also unable to demonstrate prejudice regarding counsel's failure to challenge the trial court's instructions on the lesser included offenses. As Quintero acknowledges, the trial court instructed the jury that second degree murder was a lesser included offense of felony murder. However, because the jury convicted Quintero of the greater offense, any argument that the trial court should have instructed the jury on any other offenses would have been rejected. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Finally, under this heading Quintero also challenges counsel's lack of argument regarding the instruction on premeditation and deliberation. However, as the post-conviction court concluded, the instruction in this matter was in accordance with the law at the time. Regardless, because he was convicted of felony murder, and not premeditated first degree murder, Quintero is unable to establish prejudice on this ground.

II. Funding by the Trial Court

Quintero argues that the trial judge essentially deprived him of the effective assistance of counsel by persistently refusing to grant investigative funding to the public defender's office. He further argues that this lack of funding created a conflict of interest in that counsel was prevented from adequately investigating this case on their own because of their responsibility to devote time to their other clients.

Quintero has failed to carry his burden of proof regarding this claim. Although Attorney Weems testified that he did not remember requesting funding for an investigator, he was aware of the court's denial of the same request in other capital cases in which he was involved. Attorney Stack testified that he did, in fact, investigate the facts of the case. As part of his investigation, Attorney Stack traveled to both Memphis and Kentucky. Moreover, defense counsel was provided free access to the State's file in the case. The Court has already found counsel's representation constitutionally effective regarding potential witnesses Mr. Quintero and Ms. Bernhardt, and Quintero failed to introduce any other favorable evidence at the hearing below which could have been discovered by an independent investigator.

## III. Other Constitutional Challenges

Quintero makes a general challenge to the sufficiency of the evidence. However, this issue was previously determined on direct appeal. Tenn. Code Ann. § 40-30-106(h); 976 S.W.2d at 14041. Quintero's challenge to the proportionality review conducted by the supreme court must also fail. See State v. Bland, 958 S.W.2d 651, 662-68 (Tenn. 1997) (discussing history and purpose of proportionality review and finding Tennessee's method adequate to identify and invalidate aberrant death sentences). Quintero again proffers a general challenge to the exclusion of jurors for cause based on their stance on capital punishment. We have already addressed the merits of this claim in another context. Quintero challenges the constitutionality of lethal injection. Our supreme court, however, has upheld the State's use of lethal injection to carry out death sentences. See Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 314 (Tenn. 2005).[1] In addition to challenging certain jury instructions under the guise of an ineffective assistance of counsel claim, Quintero also makes a general claim that those same instructions are unconstitutional. For the reasons we stated earlier, this claim is without merit.

On direct appeal, the appellants challenged the constitutionality of Tennessee's death penalty statute. Citing established case law, this Court held that the imposition of the death sentence under our statutory scheme is not capricious or arbitrary. 976 S.W.2d at 166. Quintero now revisits his general challenge and asserts a number of other familiar arguments why Tennessee's procedure employed to impose the death penalty is unconstitutional. These claims, however, have all been decided against Quintero's favor and must, therefore, fail. See generally State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981).

---

[1] United States Supreme Court upholding the use of lethal injection. Baze v. Rees, 128 S.Ct. 1520 (2008).

Similarly, Quintero's claim that the imposition of the death penalty in this case violates his constitutional rights because he was unlawfully seized from Mexico has previously been determined. Quintero raised this issue on direct appeal, but this Court find no merit to the claim. 976 S.W.2d at 159-61. Finally, Quintero argues that his death sentence violates the United States Supreme Court's holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002) because the aggravating circumstances upon which the State relied were not listed in the indictment returned by the grand jury. However, the Tennessee Supreme Court has held that Apprendi and its progeny do not affect Tennessee capital cases and do not require the State to charge in the indictment the aggravating circumstances supporting the imposition of the death penalty. See State v. Berry, 141 S.W.3d 549, 558-62 (Tenn. 2004). Thus, Quintero's argument before us must fail.

Appellant Hall's Issues

I. Claims Regarding Counsel's Representation
A. Pretrial and Trial Assistance
1. Alibi

Initially, Hall contends trial counsel rendered ineffective assistance by failing to adequately investigate his alibi defense. Hall argues that counsel should have filed a bill of particulars requiring the State to identify the time and date of the murders. Further, he claims counsel should have called Quintero's father to testify as an alibi witness.

The post-conviction court found that Hall's alibi was manufactured after trial. The court thus concluded that counsel was not deficient in failing to present evidence in support of the alleged alibi. We likewise find Hall's post-conviction testimony lacking, and we, therefore, conclude that Hall has failed to prove, by clear and convincing evidence, the allegations of fact in support of his claim in this respect. Hall acknowledged he knew before trial that the murders took place sometime between June 18 and June 22, 1988, a portion of which time he was supposedly not in the Leatherwood community. Hall claims he was in Memphis the night the murders took place, June 20, 1988. Yet he did not tell his attorneys about this fact, despite being told by his attorneys that the murders were committed when he supposedly was not there. Roberts testified she was aware of the State's theory on the time of death because she attended Blanton's trial.

Hall stated he did not pay much attention to the trial testimony. The trial court found this statement "farfetched" given the fact that Hall was on trial for a capital crime. The evidence demonstrates that Hall had some idea prior to trial when the murders occurred. He now asks this Court to believe that he sat through an entire six week trial, knowing he was not on the scene at the time of the crime, without voicing any concern to his attorneys. We, however, do not place much weight on his post-conviction testimony. Roberts testified that Hall took his cues from Quintero. She received the impression that the two defendants "were not going to have any different story about the events that went on. They had a common goal." Roberts testified that if either defendant had an alibi and the other did not, neither defendant was going to cross the other. Indeed, Hall

specifically told counsel that he did not want his case severed from Quintero's. Roberts testified that Hall instructed her not to implicate either Quintero or Blanton because "they were in it together and their stories were going to stay the same."

Interestingly, although Hall testified at the hearing about his alleged alibi, he failed to mention anything about the alibi in his original pro se post-conviction petition. This despite his testimony that he read the supreme court's opinion which pinpointed the time of death. Hall testified he relied upon Quintero to help him draft his petition. This is consistent with Robert's testimony that Hall followed Quintero's lead during trial.

We have already discussed the proposed testimony by Celerino Quintero during our review of Quintero's issues. We conclude that Hall's trial attorneys were not ineffective for failing to call Mr. Quintero as an alibi witness. We note that, in view of the fact that Mr. Quintero was the main alibi witness, it strains credulity to believe that this alibi witness was not mentioned. Hall apparently followed Quintero's lead throughout trial, and even during the filing of the original post-conviction petitions. Our conclusion with respect to Quintero's claim that his attorneys were ineffective for calling his father as an alibi witness applies equally to Hall's argument. We do not find counsel's conduct to be deficient in this respect.

Roberts testified that she received from Hall only those facts which he wanted to impart. Counsel told Hall the time frame of the murders, and counsel cannot be held accountable if Hall decided not to tell them he was not present during a period of that time-frame. Though counsel did not file a bill of particulars, we do not find counsel's conduct deficient. Counsel acknowledged they had open access to all of the State's files. Robert's stated she was not surprised by the testimony of the fishermen who heard the gunshots the night of June 20, 1988. Roberts testified their defense strategy was to highlight the State's circumstantial evidence. Indeed, both Quintero and Hall maintained the same defense. We find the performance of Quintero's attorneys reasonable regarding their defense strategy. Likewise, based upon our complete review of the record, and in light of the State's reliance upon circumstantial evidence in its case in chief, the defense theory employed by Hall's attorneys was reasonable.

We are reminded that "[j]udicial scrutiny of [counsel's] performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278 (quoting Strickland, 466 U.S. at 689). Moreover, we must defer to counsel's trial strategy and tactical choices if they are informed ones based upon adequate preparation. Hellard, 629 S.W.2d at 9. The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad, 938 S.W.2d at 369. Hall has failed to carry his burden of proof on this particular ground for relief. His contention that counsel was ineffective in failing to adequately investigate the alleged alibi defense is without merit. Because we find that counsel's performance was not deficient, we need not address the prejudice prong established in Strickland.

-54-

## 2. State's Expert Witnesses

Next, Hall contends that trial counsel failed to take the necessary action to challenge the testimony of the State's expert witnesses regarding the time it took Mrs. Vester to die and the evidence indicating Hall's fingerprints were found on various items recovered near the scene of the murders. The post-conviction court concluded that Hall failed to carry his burden of proof. An appellant is required to establish the factual allegations contained in his petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(2)(f). Hall did not introduce any proof to establish how the hiring of experts in either of these fields would have benefitted his defense. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so that the post-conviction court can properly evaluate the evidence or witness. See Black, 794 S.W.2d at 757. "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." Id. Hall did not produce any medical or fingerprint expert at the post-conviction hearing to call into doubt the testimony of the State's experts at trial. We agree, therefore, that he failed to satisfy his burden of proof on this ground of his ineffective assistance of counsel claim. We address below Hall's separate claim that he was denied funding for an expert in forensic pathology.

## 3. Eyewitness Testimony

Hall argues that counsel was ineffective in challenging the State's eyewitnesses who testified seeing three men with beards exit the victims' car in Memphis. Although Ben Spencer, the prison barber, testified that he cut Hall's hair just before Hall's escape and, furthermore, that Hall was unable to grow facial hair, Hall now asserts that this witness was not credible and counsel should have more thoroughly investigated his background prior to trial. Quintero raises a similar ground of ineffective assistance of counsel which we find to be without merit. Likewise, we do not find that the conduct of Hall's attorneys was deficient in this respect. Counsel did investigate and was aware of Hall's inability to grow a beard. Counsel identified who they believed would have been the best witness to testify about Hall's short hair and lack of beard. This information was imparted to the jury. Counsel, however, had no reason to check civil court records in another state for possible name changes of witnesses. Accordingly, counsel's performance in this respect did not fall below objective standard of reasonableness which is demanded of attorneys.

## 4. Trial Counsel's Qualifications

Hall presents several arguments specifically addressing Attorney Roberts' representation. First, he contends that Roberts was not qualified to serve on this capital case. Based upon her general legal inexperience at the time, Hall suggests that Roberts' involvement in the case prejudiced his defense. Roberts testified that she was primarily responsible for preparing for the sentencing phase of the trial. Hall now argues that Roberts' performance in this respect was deficient. Specifically, he contends that Roberts did not provide Dr. Anchor with all of the necessary information he needed to make an informed opinion and that she did not adequately investigate his

social history or call sufficient witnesses to testify on his behalf. To support this argument, Hall introduced during the post-conviction hearing the testimony of other mental health experts and family members which he claims would have bolstered his mitigation during sentencing.

Although Hall argues that Roberts' legal experience did not qualify her for appointment by the trial court, Hall fails to demonstrate any resulting prejudice based on this fact alone. Roberts testified that she moved to withdraw from the case. However, the trial court denied her request and appointed another, more experienced, attorney to assist. Hall does not specifically challenge the qualifications of Attorney Bagwell in this respect. Regardless, we cannot find any prejudice based solely on Roberts' experience at the time of her appointment. The relevant provision of Supreme Court Rule 13, which establishes minimum qualifications for the appointment of attorneys in capital cases, was not placed into effect until July 1, 1997. See Tenn. Sup. Ct. R. 13 (1997). Accordingly, Roberts' appointment did not offend then existing rules governing the appointment of counsel. We will now address the specific allegations raised by Hall concerning Roberts' conduct during sentencing.

## 5. Mitigation

Hall asserts that Roberts rendered ineffective assistance of counsel when she failed to provide Dr. Anchor with the necessary information he needed to make an informed opinion about Hall's psychological condition. In support of this argument, Hall called Dr. Auble to testify at the post-conviction hearing. Dr. Auble interviewed Hall and reviewed all relevant records, presumably some of which Dr. Anchor did not see. Dr. Auble concluded that Hall has no neurological dysfunction, brain damage or organic problems. According to Dr. Auble's review of Dr. Anchor's evaluation, she did not believe Dr. Anchor was provided enough information about Hall's history to render an informed opinion. Dr. Auble testified that Dr. Craddock, the State's expert, was a more credible witness. In essence, Dr. Auble agreed with Dr. Craddock's diagnosis rather than Dr. Anchor's. Hall's argument seems to be that Dr. Anchor's diagnosis would somehow have been different had counsel more thoroughly investigated Hall's background and passed along the discovered information to Dr. Anchor.

A summary of Dr. Anchor's testimony was provided by the supreme court on direct appeal:

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt and a clinical psychologist, testified that he prepared a psychological evaluation of Hall in 1991. He testified as to the background information conveyed by Hall during the interview. Hall grew up in Paducah, and his formal education ended after the ninth grade. He later earned his GED while incarcerated. Hall began using drugs and alcohol at age eleven and was addicted to Valium by age fourteen. He was placed in juvenile detention several times and was sent to a youth development center. Hall worked at different jobs while a young adult, but he had mostly been in and out of prison since age seventeen. Hall informed Dr. Anchor that he had experienced two head injuries. He fell off a porch as a baby and was struck in the head with a baseball

-56-

bat when he was fourteen.

Dr. Anchor testified that Hall was cooperative and responsive during the interview. Hall did not offer any excuses or attempt to blame others. There was no indication of malingering. Moreover, Hall was enthusiastic about his plans to pursue college courses in computers and data processing while incarcerated.

Hall scored a 99 on his I.Q. test which placed him in the 48th percentile. Dr. Anchor testified that although Hall has a reasonable amount of intelligence, he has some difficulty utilizing it. Hall experiences cognitive interference which is frequently seen in people who have habitually abused drugs and alcohol. Dr. Anchor found Hall's judgment, reasoning, and problem-solving skills to be "unstable." According to Dr. Anchor, that finding is consistent with a history composed of head injuries and substance or polysubstance abuse.

Dr. Anchor concluded that Hall is seriously maladjusted and suffers from organic personality syndrome. Dr. Anchor stated that persons with test profiles similar to Hall's usually have a strong sense of worthlessness and inferiority. Hall feels a deep sense of shame, embarrassment, and humiliation for many of his past actions. Dr. Anchor opined that Hall's psychological maladjustment can be treated effectively with counseling or psychotherapy. At the time of trial, Dr. Anchor stated that Hall did not present a danger either to himself or to others in a prison setting. Dr. Anchor opined that Hall's prognosis was good assuming he abstained from future substance abuse. Dr. Anchor concluded that the prospects for social, educational, and vocational functioning were satisfactory.

976 S.W.2d at 132. The post-conviction court made the following statements regarding Hall's allegation that Roberts did not effectively investigate his background or provide the necessary information to Dr. Anchor:

In summary, the expert psychological proof presented at the post-conviction hearing was no more favorable to Appellant than was Dr. Anchor's testimony presented at his trial except that the post-conviction experts focused more on Appellant's childhood. In fact, Dr. Anchor's testimony as to his conclusions impressed this Court as more favorable to the Appellant that did the post-conviction experts. Dr. Auble disagreed with Dr. Anchor's methodology and conclusions from a professional standpoint but this was essentially what Dr. Craddock did at trial except Dr. Auble disagreed more strongly than did Dr. Craddock. All of this professional concern would have had minimal effect upon the jury. Dr. Anchor testified at trial more favorably toward Appellant than did any of the post-conviction witnesses and Dr. Craddock testified that he could not agree with Dr. Anchor's diagnosis of organic personality syndrome without having more data available to him. He did not specifically disagree with the diagnosis. Dr. Craddock did assess Appellant's level

of dangerousness higher than did Dr. Anchor. In all, the psychological testimony at trial was more favorable to appellant than that presented at the post-conviction hearing. This Court finds that, of the psychological witness[es] presented to this Court, Appellant's trial counsel presented the most favorable testimony at the trial. Trial counsel cannot be faulted for failing to be aware of more favorable witnesses when they presented the best witness that was presented. Post-conviction counsel was granted every request for expert witnesses that they presented and had more time to assemble such witnesses and still the psychological testimony at trial was more favorable to Appellant as a jury would view it than the expert proof presented at the post-conviction hearing. . . .

It is apparent from the record at the post-conviction hearing that Appellant likely does not have organic brain damage. From a psychological standpoint, this fact is highly relevant. From a legal standpoint of whether Appellant received effective representation of counsel, it is less so. As has been stated herein above, the trial testimony favored appellant much more than did the post-conviction testimony. Dr. Craddock was less forceful and specific in his disagreement with Dr. Anchor than was Dr. Auble. In fact, Dr. Craddock's disagreement with Dr. Anchor could best be described as "mild." Dr. Anchor may have been (and probably was) in error when he testified about appellant's organic brain damage but Appellant was benefitted, not prejudiced, by the error.

We conclude that Hall has failed to demonstrate any resulting prejudice from Roberts' alleged deficiency regarding this aspect of mitigation. The burden is on Hall to prove that, but for counsel's conduct, there is a reasonable probability that the jury's verdict at sentencing would have been different. He has not carried his burden on this claim. We agree with the post-conviction court's finding that Dr. Anchor was a more favorable mitigation witness for Hall than Dr. Auble would have been. Dr. Anchor's diagnosis of Hall's psychological condition was contested by the State's expert in rebuttal. Had Dr. Auble testified at trial, the State's expert's opinion, that Hall was more dangerous than Dr. Anchor opined, would simply have been reinforced. Accordingly, we do not find Roberts' representation in this respect to have been ineffective.

Next, Hall argues that Roberts "had no mitigation experts available to assist in developing the life history of William Hall. She had no investigator, mitigation specialist or other expert services, other than the bungled mental health evaluation with Dr. Anchor." Hall thus contends counsel was ineffective in painting a favorable picture of mitigation, and he offered the testimony of several expert and family witnesses during the post-conviction hearing which he claims would have been beneficial during sentencing. The post-conviction testimony of Ms. Wolkhaner, Dr. Smith, Dr. Eys, Ms. McNeill, Ms. Newton and Ms. Cook is summarized above. These witnesses offered insight into Hall's background, including his troubled upbringing as a child and his alcohol and drug abuse. However, as the post-conviction court found, the three witnesses who testified on Hall's behalf at trial in mitigation, Dr. Anchor, Robert Hall (Hall's brother), and Ms. Vasser, revealed to the jury similar information about Hall's life. Hall's brother testified about the abuse

Hall suffered as a child, their unstable home life, and the fact that they were not disciplined or taught right from wrong. 976 S.W.2d at 131-32. He also spoke of Hall's exposure at an early age to drugs and alcohol, and informed the jury that his brother was a follower, not a leader. Id. Dr. Anchor related to the jury the social history he obtained from Hall during his interviews with him. He testified about Hall's addiction to drugs and alcohol, and his run-ins with the authorities as a juvenile. Id. at 132.

The post-conviction court determined that the testimony of the post-conviction witnesses was cumulative to the mitigation evidence presented at trial. Accordingly, the court concluded that the testimony would not have affected the jury's sentence. Our review of the record leads us to the same conclusion. Hall has not carried his burden on proof on this claim. Because the mitigation evidence presented during the post-conviction hearing was similar in nature to the evidence actually introduced at trial, we do not find that Roberts' handling of mitigation in this respect was deficient. Regardless, Hall has not demonstrated any prejudice. The jury would have learned little, if anything, new from these witnesses. Given the number and strength of the aggravating circumstances, we do not believe these additional mitigating witnesses would have resulted in a different outcome. Hall's assertion of this ground of ineffective assistance must, therefore, fail.

## B. Appellate Assistance

Hall asserts that his attorneys rendered ineffective assistance on appeal. He contends that, given counsel's paltry performance on appeal, prejudice is presumed. Counsel's conduct following the jury's verdict at sentencing is recounted above throughout the testimony of Attorney Roberts. The post-conviction court concluded that counsel's performance on appeal was deficient. The court made the following statements:

> This Court finds that appellate counsel's performance on appeal was abominable. Counsel's performance fell far below the standard expected of counsel in the appeal of a capital case (or any other case for that matter). Counsel's appellate briefs (both in the Court of Criminal Appeals and the Supreme Court) [were] a copy of that filed by defendant Quintero, often even containing allegations relating to Quintero alone. Even then, the brief was filed late in the Court of Criminal Appeals. The cause of this failure was different for each counsel. Mr. Bagwell, lead counsel, had apparently begun his mental and physical decline the reason for which this Court can only speculate. The onset was apparently rapid and complete. He was, with varying degrees of success, attempting to maintain a facade of normality while his actual performance dropped to below substandard levels. He apparently devoted little time to his practice of law.

> Ms. Roberts, on the other hand, was placed in an untenable position by Mr. Bagwell's decline. The proof at the post-conviction hearing establishe[d] that Ms. Roberts began to have communication problems with Mr. Bagwell after the conviction in this case. Ms. Roberts expected that Mr. Bagwell would draft the

-59-

motion for new trial but, in checking just before the time for filing of the motion for new trial expired, she discovered that the motion had not been filed. Therefore, she hurriedly filed one herself. At the time, Ms. Roberts didn't notice that Mr. Bagwell was not attending to his practice. Upon consulting with Mr. Bagwell, Ms. Roberts was advised that Mr. Bagwell had an individual in his office who was engaged in condensing the transcript into a narrative account. She received the document "a couple of days before the brief was due." Ms. Roberts continued to call Mr. Bagwell's office asking if there was anything that she should do in preparation for the appeal. She did not receive a response to her inquiries. At that point, Ms. Roberts was not overly concerned. She testified that Mr. Bagwell "had a vast enough amount of experience in this and tried a wonderful case, in my estimation, and I thought that he was handling it."

With regard to the writing of the brief for the Court of Criminal Appeals, Ms. Roberts testified that Mr. Bagwell assured her that they would get an extension of time in which to file the brief and that they would get together about the brief. At that time, Ms. Roberts had no cause to think that he would not do otherwise. As the time for filing the brief came and passed, Ms. Roberts became increasingly anxious concerning the filing of the brief. Attempts to contact Mr. Bagwell were usually unsuccessful. As secondary counsel, Ms. Roberts [was] understandably reticent to "take matters in her own hands" since Mr. Bagwell had assured her that the brief was being prepared. Later, Mr. Bagwell told her that she would have to write the brief. By the time he told her this, there was not sufficient time (two days) to prepare an adequate brief. Ultimately, Mr. Bagwell filed the brief, which was essentially a copy of Quintero's brief. A number of the issues in the brief filed by Mr. Bagwell did not pertain to [Hall].

The proceedings in the Supreme Court went about the same as in the Court of Criminal Appeals except that Ms. Roberts waited for Mr. Bagwell to file the brief and, when he did not, she took his previous brief, edited it and filed it on time. Even so, she did not have time to file a [thorough] brief. Ms. Roberts testified that it was "humiliating doing it the way that I did." She said it was an embarrassment for her to have her name associated with such shoddy work. Ms. Roberts has practiced before this Court for many years and this Court has never known her to be unprepared or even poorly prepared. She testified that, in her sole practice, she had never asked for an extension to file an appellate brief. Mr. Bagwell did the oral arguments in both appellate courts.

There is no question that the quality of the appellate representation of [Hall] fell far below the standard expected of appellate counsel in a capital case. Mr. Bagwell's failure was due to his mental and physical decline and Ms. Roberts' due to her reliance upon Mr. Bagwell and her uncertainty concerning what action she should take because of her role as secondary counsel. At the time, Ms. Roberts had no

reason to think that Mr. Bagwell would not perform the functions which he told her he would. This Court notes that some very able and talented trial lawyers are notoriously casual about procedure and deadlines. They almost always seem to comply with the procedural requirements but not without causing anxiety to those connected with them. Ms. Roberts had no reason to think that this situation was any different. In any event, [Hall] did not receive the level of representation to which he was entitled. The answer to the first question of the <u>Strickland</u> inquiry is that appellate counsel was ineffective.

Our review of the record in light of Attorney Roberts' testimony leads us to the same conclusion. The attorneys appointed to represent Hall on appeal to both this Court and the supreme court performed below an objective standard of reasonableness, that is, well "outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690. We must next determine whether counsel's deficiency during direct appeal prejudiced Hall's defense. The burden of proof remains with Hall. The same principles apply in determining the effectiveness of both trial and appellate counsel. See <u>Campbell</u>, 904 S.W.2d at 596. An appellant alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the appellant's appeal would have been successful before the state's highest court. See <u>Smith</u>, 528 U.S. at 285. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

Hall argues that prejudice is presumed because counsel, in effect, did not provide any representation during the appeal process. See <u>United States v. Cronic</u>, 466 U.S. 648, 659-62 (1984). We disagree. Counsel did not completely abandon Hall on appeal. Although we conclude that counsel's conduct fell well below that which is constitutionally required, Hall was not deprived of a meaningful appellate review of his conviction and sentence. As counsel for both appellants testified at the post-conviction hearing, the defense theory for Hall and Quintero was the same. And although Roberts testified that counsel relied upon the motion for new trial and appellate brief filed by Quintero's attorneys, numerous issues were, in fact, ultimately presented on Hall's behalf to the courts for post-trial and appellate review. See generally 976 S.W.2d 121. Consequently, we do not find "that there was [such] a breakdown in the adversarial process that would justify a *presumption* that [Hall's] conviction [and sentence were] insufficiently reliable to satisfy the Constitution." <u>Cronic</u>, 466 U.S. at 662 (emphasis added). The post-conviction court considered the issues Hall proffered in support of his attempt to show that the result of the proceeding would have been different and concluded none had merit.

On appeal, Hall merely references the petition he filed in the trial court which contains a list of issues he contends counsel should have raised on appeal. However, the majority of the issues presented in the written petition are unsupported by argument or citation to relevant authorities. Moreover, Hall does not offer any specific argument on appeal regarding the merits of the individual issues. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). He

instead relies upon his argument that prejudice should be presumed. We have already concluded, however, that this is not a case where Hall was completely deprived of representation on appeal. Despite the apparent waiver, for the reasons stated hereafter, we find no resulting prejudice regarding the specific allegations asserted by Hall.

Hall contends counsel did not effectively challenge on appeal the State's fingerprint evidence. As we have already concluded, Hall failed to carry his burden on this particular issue. Hall also argues counsel was ineffective for not challenging the trial court's denial of his motions for expert and investigative assistance. As we stated earlier, Hall did not proffer any evidence at the hearing below which would have demonstrated any resulting prejudice. See Black, 794 S.W.2d at 757. Hall also contends counsel did not effectively argue on appeal that the State made improper argument at trial. As the post-conviction court observed, Hall does not identify the nature of the alleged impropriety or cite to the record. Accordingly, this contention is likewise waived on appeal. Next, Hall argues counsel failed to adequately present the sufficiency of the evidence issue on appeal. However, the appellate courts reviewed the entire record and concluded on direct appeal that the evidence was sufficient. 976 S.W.2d at 140-41. This claim is without merit. Hall argues the indictment was vague and inadequate because it failed to give notice of the offenses with which he was charged. However, he does not offer any argument or cite to any authority in support of this blanket statement. This argument is, therefore, waived.

Next, Hall contends counsel was ineffective for challenging on appeal certain jury instructions. He argues the trial court's instructions shifted the burden of proof of an element of the crime to Hall. However, Hall does not identify the specific instruction of which he complains. As the trial court observed, no reference to this instruction was made during the hearing below. Moreover, Hall does not proffer any explanation about this claim on appeal. This argument is, therefore, waived. Hall also argues the trial court improperly instructed the jury that it need not find malice to convict the defendants of felony murder. Hall is unable to establish prejudice in this instance because, as the post-conviction court noted, this Court has previously ruled against this argument. See Norris, 684 S.W.2d at 652. Next, Hall argues the instruction on "reasonable doubt" was unconstitutional. This specific issue, however, was decided against his favor on direct appeal. 976 S.W.2d at 159. Thus, prejudice cannot be found. Hall argues the trial court's instructions were improper because they required the jury to presume the truthfulness of witnesses. This specific argument has been held to be without, thus no resulting prejudice can be shown. See Hull v. State, 553 S.W.2d 90, 93 (Tenn. Crim. App. 1977). Hall argues the trial court erred by not instructing the jury on all lesser included offenses. However, because the jury convicted Hall of the greater offense, any argument that the trial court should have instructed the jury on any other offenses would have been rejected. See Williams, 977 S.W.2d at 106. Finally, Hall argues the trial court's instructions improperly defined the presumption of innocence. However, Hall does not offer any argument or citation to relevant authority to support this claim. The claim is, therefore, waived.

Hall asserts that counsel failed to challenge on appeal the jury selection process. Specifically, he argues the trial court improperly excluded jurors opposed to the death penalty. This claim was addressed on direct appeal and found to be without merit. 976 S.W.2d at 141-42. He also argues

the jury did not represent a fair cross-section of the community. However, Hall has failed to carry his burden on this claim. He offered no proof at the hearing below to support his argument. Similarly, his argument that the State improperly used peremptory challenges to exclude certain individuals is not supported by any proof. Hall has failed to satisfy his burden of proof on this claim. We likewise find that Hall has failed to carry his burden of proof regarding his allegation that the jury was exposed to extraneous and prejudicial influences. There is simply no proof in the record to support his argument in this respect. Finally, Hall argues the trial court failed to redress the State's incorrect definitions during voir dire of the elements of the charge, burdens of proof, and sentencing terms. However, Hall does not cite to any portion of the record where these alleged instances of misconduct occurred. His argument in this respect is, therefore, waived.

In his reply to the state's brief, Hall simply states: "The State asserts the position that the appellant has not shown how he was prejudiced by the deficient performance of his counsel. Appellant Hall submits that the inadequacies of his appellate counsel amounted to a complete abdication of their duties - the equivalent to not filing an appeal at all and with that, prejudice is presumed." Again, Hall is required to prove both prongs of the Strickland test for ineffective assistance of counsel. Deficient performance is but one element. We conclude that Hall has failed to demonstrate the requisite prejudice. A blanket accusation is insufficient. Hall does not offer any argument on appeal, nor citations to the record or relevant authorities, to show that there is a reasonable probability that the presentation of the issues addressed above would have resulted in a different opinion by the appellate courts. We must, therefore, conclude that Hall was not prejudiced by his attorneys deficient performance on appeal.

Finally, under this heading, Hall argues counsel failed to adequately challenge the constitutionality of the death penalty. On direct appeal, the appellants challenged the constitutionality of Tennessee's death penalty statute. Citing established case law, this Court held that the imposition of the death sentence under our statutory scheme is not capricious or arbitrary. 976 S.W.2d at 166. Hall now revisits his general challenge and asserts that counsel failed to adequately address on appeal a number of other familiar arguments why Tennessee's procedure employed to impose the death penalty is unconstitutional. Because all of these claims have been decided against Hall's favor, he is unable to demonstrate prejudice. See generally State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Harris, 839 S.W.2d 54 (Tenn. 1992); State v. Groseclose, 615 S.W.2d 142 (Tenn. 1981).

II. Use of Physical Restraints During Trial

Hall contends he was improperly shackled during trial in the presence of the jury in violation of his due process rights. Again, Hall bears the burden of proving the allegations of fact supporting this ground for relief by clear and convincing evidence. Tenn. Code. Ann. § 40-30-110(f). The evidence at the hearing below on the shackling issue consisted of the testimony of one juror and the deputy sheriff responsible for transporting the appellants to and from the jail. The juror testified he remembered seeing the appellants brought into the courtroom in shackles as the jury was in the box

"setting up." However, the evidence does not demonstrate during which stage of the trial this occurred. The deputy sheriff testified that he brought the appellants into the courtroom in shackles, however, he testified he always removed the restraints before the jury entered. He testified that the appellants never appeared in handcuffs or shackles in the presence of the jury. The post-conviction court found as a matter of fact that the appellants were in leg shackles during the penalty phase of the trial but not the guilt phase. The trial record supports this finding. Prior to the commencement of the sentencing stage, counsel for the appellants requested that the shackles be removed. Based upon the deputy's observations that the shackles were hidden from the jury's view, the trial judge refused.

Deck v. Missouri clearly established a new rule of constitutional law: routine shackling of a defendant during the penalty phase of a capital trial, absent the showing of a case specific security need, violates the defendant's due process rights unless the state demonstrates beyond a reasonable doubt that the shackling did not contribute to the sentence imposed. 544 U.S. 622 (2005). At least two federal circuit courts have so recognized this new rule. See Lakin v. Stine, 431 F.3d 959 (6th Cir. 2005); Marquard v. Sec'y. Dept. of Corrections, 429 F.3d 1278 (11th Cir. 2005), cert. denied, Marquard v. McDonough, 126 S.Ct. 2356 (2006). Despite the pronouncement of this new rule, the United States Supreme Court stated that the general prohibition against physical restraints during the *guilt phase* of a trial is deeply rooted in the common law.

Hall did not previously challenge the unconstitutionality of the use of physical restraints during either the guilt or sentencing phase of the trial. Generally, a ground for relief in a post-conviction petition is considered waived if it was not presented for review in an earlier proceeding. Tenn. Code Ann. § 40-30-106(g)(1). Because the prohibition against shackling during the guilt phase of a trial was not newly recognized by the Supreme Court in Deck, any aspect of this particular claim which could be construed as a challenge against the use of restraints during the guilt phase of the trial has been waived by Hall's failure to present it on direct appeal. The prohibition against shackling during the guilt phase has long been recognized by the courts of this state. See, e.g., Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976). Similarly, any complaint that the jury saw Hall in shackles during transport to and from the courtroom must also fail. See State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). As this Court reasoned, "[c]ommon sense must prevail in such instances where a jury or jurors inadvertently see a defendant dressed in prison clothing. Reason dictates that they must know a person on trial is either on bail or in confinement during the course of a trial." Id. Finally, to the extent the shackles were, in fact, hidden from the jury's view during the trial proceedings, Hall has no claim. See State v. Taylor, 771 S.W.2d 387, 396 (Tenn. 1989).

The post-conviction evidence does not support a finding that the appellants were restrained in the jury's presence during the guilt phase of the trial. However, Hall has carried his burden as to the sentencing phase. The transcript of the trial proceedings, in conjunction with the juror's testimony at the post-conviction hearing, supports the trial court's finding that the appellants were in shackles in the jury's presence. However, this does not end our inquiry.

Although the Supreme Court recently announced a new rule regarding shackling during the sentencing stage of a capital trial, Hall's claim in this respect must also be considered waived. Our Post-Conviction Procedure Act acknowledges an exception to the general rule of waiver of an issue which should have been raised on direct appeal. If the ground for relief is based upon a newly created right not recognized at the time of trial which requires retroactive application, it may be presented in a post-conviction petition. Id. As our supreme court observed in Van Tran v. State, "a new rule of federal constitutional law is to be applied in cases on collateral review only if it (1) places certain kinds of primary, private individual conduct beyond the power of the state to proscribe or (2) requires the observance of procedures implicit in the concept of ordered liberty [ i.e., creates a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings.]" 66 S.W.3d 790, 811 (Tenn. 2001) (citing Teague v. Lane, 489 U.S. 288, 307 (1989)). A somewhat different standard governs retroactivity of new state constitutional rules. Id.

The federal court of appeals in Marquard addressed this very issue in the same procedural context as the instant case. The court in that case reviewed a defendant's death sentence in a habeas petition following the exhaustion of state post-conviction remedies. The Eleventh Circuit Court of Appeals, however, declined to retroactively apply the new rule announced in Deck. Though the court initially stated that the defendant's due process claim, based upon the impermissible handcuffing in front of the jury, was without merit because there was no supporting evidence in the record, Marquard, 429 F.3d at 1309, the court went on to hold that the Deck rule was not to be applied retroactively, Id. at 1311. Noting that the new rule is procedural rather than substantive, the court held that the first exception to the Teague rule of non-retroactivity, cited above, did not apply. Id. at 1312.

The Eleventh Circuit further stated:

The second exception is also not met because Deck's new rule is not one of those "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings." Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 2523 (2004) (quotation marks and citations omitted). "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is *seriously* diminished." Id. (quotation marks and citation omitted). Indeed, the Supreme Court has explained that "[t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." Id. (quotation marks, citations, and punctuation omitted).

Deck's new rule - that routine shackling during the penalty phase of a capital trial, without a case specific finding that security needs require shackling, violates due process unless the state shows it did not contribute to the verdict - is indisputably important for defendants. However, Deck's new constitutional rule is not absolute, and a defendant may be shackled before the jury if the trial court determines that security needs or other factors so dictate. Accordingly, the absence of the Deck rule does not cast serious doubt on the accuracy or fundamental fairness of the

proceedings, and thus does not fall within the narrow exception for watershed procedural rules. As a result, Deck's new rule for the penalty phase of a capital trial does not apply retroactively to Marquard's case. Therefore, Marquard has not shown that any assumed shackling during the penalty phase violated his federal due process rights in 1993.

Id.

We find the Eleventh Circuit's opinion in Marquard to be persuasive on the issue. The court's reasoning that the Deck rule should not be applied retroactively is sound. Accordingly, Hall's post-conviction challenge on this issue must fail.

### III. Jury Instructions

In addition to challenging certain jury instructions under the guise of an ineffective assistance of counsel claim, Hall also makes a general claim that the trial court's instructions relating to malice and any lesser included offenses were unconstitutional. For the reasons we stated earlier, this claim is without merit. As does Quintero, Hall also challenges the trial court's instruction on premeditation and deliberation. However, as the post-conviction court concluded, the instruction in this matter was in accordance with the law at the time. Hall fails to support this claim with any legal argument or citation to authorities. See Tenn. Ct. Crim. App. R. 10(b). Regardless, because he was convicted of felony murder, and not premeditated first degree murder, any error regarding this instruction is harmless.

### IV. Felony Murder Aggravating Circumstance

Hall argues reversible error occurred at trial when the jury found the existence of the felony murder aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(7) (1982), despite the fact that he stood convicted of murder committed during the perpetration of a felony. However, this issue was addressed on direct appeal and the supreme court found that the jury's reliance on this lone invalid aggravator was harmless beyond a reasonable doubt. 976 S.W.2d at 134 n.8. The courts determined the remaining aggravating circumstances were properly applied. Id. at 133-34, 162-66. This ground for relief has thus been previously determined. Tenn. Code. Ann. § 40-30-106(h).

### V. Other Constitutional Challenges

Hall also argues that his death sentence violates the United States Supreme Court's holdings in Apprendi v. New Jersey and Ring v. Arizona because the aggravating circumstances upon which the State relied were not listed in the indictment returned by the grand jury. However, the Tennessee Supreme Court has held that Apprendi and its progeny do not affect Tennessee capital cases and do not require the State to charge in the indictment the aggravating circumstances supporting the imposition of the death penalty. See Berry, 141 S.W.3d at 558-62. Thus, Hall's argument before us must fail.

Hall contends the prosecutor's unlimited discretion in seeking the death penalty renders the process unconstitutional. This argument, however, has also been repeatedly rejected by our supreme court. See State v. Smith, 993 S.W.2d 6, 27 (Tenn. 1999). Hall also challenges the constitutionality of lethal injection. Our supreme court, however, has upheld the State's use of lethal injection to carry out death sentences. See Abdur'Rahman, 181 S.W.3d at 314. Accordingly, this challenge must fail.

Citing established case law, this Court held on direct appeal that the imposition of the death sentence under our statutory scheme is not capricious or arbitrary. 976 S.W.2d at 166. Accordingly, Hall's post-conviction claim to the same effect must be deemed to have been previously determined. Tenn. Code Ann. § 40-30-106(h). Hall's challenge to the proportionality review conducted by the supreme court must also fail. See Bland, 958 S.W.2d at 662-68 (discussing history and purpose of proportionality review and finding Tennessee's method adequate to identify and invalidate aberrant death sentences).

## VI. Post-Conviction Hearing

Finally, Hall argues on appeal that the post-conviction court denied him a full and fair hearing on the grounds for relief asserted in his written petition. Specifically, he contends he was denied the opportunity to present expert testimony to support specific allegations regarding his claim of ineffective assistance of counsel. Hall requested the services of an eyewitness identification expert and a forensic pathologist expert. Hall filed a written motion for the eyewitness expert prior to the hearing, but only made an oral request for the forensic pathologist expert during the hearing. The trial court denied both requests. The court concluded that, although Hall generally alleged trial counsel was ineffective for challenging the eyewitness testimony and the testimony concerning the time it took Ms. Vesters to die, he failed to show a particularized need for the experts at the hearing. The trial court also concluded that Hall did not timely make his request for the forensic expert services.

Pursuant to the law governing the authorization of expert services at the time of the hearing in this case, indigent appellants in capital post-conviction proceedings are entitled to investigative or expert services if the trial court, in its discretion, determines that the services are necessary to protect the constitutional rights of the appellant. Supreme Court Rule 13, Section 5(a) (2003). An appellant must show there is a particularized need for the services; that is, "the appellant must demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and that the appellant is unable to establish that ground for post-conviction relief by other available evidence." Owens v. State, 908 S.W.2d 923, 929 (Tenn. 1995). "An unsupported allegation to that effect will not suffice." Id. at 930. Cf. Tenn. Sup. Ct. R. 13, §5(c)(4)(A) and (B) (2007) (a particularized need cannot be established by "undeveloped or conclusory assertions that such services would be beneficial" or "assertions establishing only the mere hope or suspicion that favorable evidence may be obtained"). Because it is within the post-conviction court's discretion whether to authorize funding for the requested expert services, on appeal we will review to determine whether the trial court abused its discretion.

-67-

The record contains copies of two separate orders denying Hall's request for a forensic pathologist; one because he did not show a particularized need and the other because his request was not timely made. Hall admits on appeal that he did not request funding for a forensic pathologist until after the hearing had commenced. Given the circumstances, we conclude that the post-conviction court did not abuse its discretion in denying funding for this expert. As the court noted, "the Petitions for Post-Conviction relief had been filed several years prior to the hearing and no request for funds for a forensic pathologist had been made until after the post-conviction trial had commenced."

The post-conviction court denied funding for the eyewitness identification expert because it found that Hall "failed to identify, with adequate specificity, the need for said expert assistance." For the following reasons, we conclude that the post-conviction court did not abuse its discretion. The controlling case law at the time of the post-conviction hearing held that Rule of Evidence 702 precluded expert testimony concerning the reliability of eyewitness testimony. See State v. Coley, 32 S.W.3d 831 (Tenn. 2000), overruled by, State v. Copeland, 226 S.W.3d 287 (Tenn. 2007). In his motion, Hall stated: "Apply[ing] Tennessee law to the case, counsel would not be entitled to the requested expert service. However, as this request could bear upon federal constitutional and statutory rights, the request is raised at this time."

Regardless of this bar, Hall's motion showed no particularized need for this expert. The motion simply stated that this expert was needed "to explore motions to suppress pre-trial identifications" because "the psychological research on eyewitness memory suggests that incorrect eyewitness identification account[s] for over one half of all the documented cases of wrongful convictions." Although Hall recounted in his motion the substance of the eyewitness testimony at trial, he did not specifically refer to any issue regarding the individual witnesses in this case which would have required the assistance of the requested expert. A commentary on the nature of eyewitness testimony in general does not demonstrate a particularized need. Moreover, on appeal, Hall similarly argues that this expert assistance was necessary for a review of the record to determine whether the services would be beneficial. However, as the supreme court has instructed, "[a] bare allegation that support services are needed is not sufficient" to satisfy the requirement of a particularized need. Owens, 908 S.W.2d at 929. Hall's argument is the very type which the supreme court intended to prevent.

Finally, Hall requested the services of this expert to support his argument that trial counsel did not adequately challenge the eyewitness identification of the employees of the bus station and the adult oriented business in Memphis. The witnesses who observed three individuals exit the victims' car in Memphis did not positively identify Hall, and he did not request the assistance of the eyewitness identification expert in relation to their testimony. However, as part of his alleged alibi, Hall acknowledged during the post-conviction hearing that he did, in fact, visit both the bus station and the adult oriented business. This Court is thus constrained to see how any challenge to this eyewitness testimony could have benefitted Hall's defense.

We cannot conclude that the post-conviction court denied Hall a full and fair hearing on the grounds for relief asserted in his written petition.  The alleged instances of misconduct on behalf of the post-conviction court are without merit.  Hall is not entitled a relief on this claim.

## Conclusion

For the foregoing reasons, we conclude that the trial court did not err by denying the petitions for post-conviction relief.  Accordingly, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE